STANDARD RICE COMPANY, INC. *v.* DILDAY.

4-3954

Substituted opinion on rehearing delivered
November 4, 1935.

*Joseph Morrison,* for appellant.

*Meehan & Moncrief,* for appellee.

JOHNSON, C. J., (on rehearing). On April 27, 1933, H. D. Dilday, and his son, H. H. Dilday, and his son-in-law, W. W. Crandall, were the holders and owners of a portion of the rice crop which they had grown during the year 1932. There were three lots of the rice, one being owned by H. D. Dilday individually, a second being owned by H. D. Dilday and his son, H. H. Dilday, and the third by Mr. Dilday and his son-in-law, W. W. Crandall. At that time J. K. Carr was the purchasing agent of the Standard Rice Company, Inc. It was his business to buy rough rice from rice farmers. Carr purchased the rice referred to for his employer, which has been sued for an alleged balance of purchase money due the sellers, and from a judgment in their favor is this appeal.

Carr and H. D. Dilday had several conferences in regard to the purchase of this rice. Dilday was unwilling to sell because there was pending legislation in the Federal Congress, which Dilday thought would be enacted and would operate to enhance the price of rice. No one appeared to know the provisions of the proposed legislation.

All of the preliminary negotiations for the sale of the rice were conducted by H. D. Dilday alone, as he acted not only for himself, but for his son and his son-in-law as well. They testified that he had this authority. The three "Rough Rice Purchase Contracts" which were finally executed were all signed by H. D. Dilday, and no one else, although each contract recites the names of the owners of the rice sold. H. D. Dilday signed for himself and the other two owners. Carr signed for the rice company, the purchaser.

H. D. Dilday relates the negotiations leading up to the sale as follows: "On the evening of April 26 Carr asked me again if I was ready to sell, and I told him that I wasn't, so he asked me why not. I told him that if the bill before Congress would pass we will get more for it. Mr. Carr says: 'We will guarantee you any loss against that, if you will sell the rice now.' I says: 'If we can agree upon the amount, I could deliver it.' We discussed the price, and he made an offer which my son didn't want to take for his rice. 'We agreed on the price, and what the rise would be, if there was any.' Mr. Carr said he would have to see the manager (of the rice company), and he called me at my home and told me that the trade was agreeable with them. I told Carr my son and son-in-law had an interest in some of the rice, and to come out the next morning for us all to get together on it. All the parties met on the morning of the 27th, and Carr related the conversation he and I had the evening before 'about guaranteeing the price if it advanced and guarantee any loss.' My son-in-law told him that that's what we are holding the rice for. I signed up as one of the members, and Mr. Carr signed, so he says 'We will have to fix a time—some definite time when this guarantee will end.' He suggested that

we fix the time at May 31. That was agreed upon, and he told us that we were to get the benefits of any rise between that time and May the 31st, but it had to be done by that time, that is, the bill had to pass by May 31, and the price of rice had to go up. When this agreement was reached, the purchase slips were written up on the morning of April 27 in the presence of Mr. Crandall, myself and my son."

These Rough Rice Purchase Contracts, three in number, are identical except as to their numbers, the names of the sellers and the quantity of the rice sold. No. 498, covering the rice of H. D. Dilday and his son-in-law, W. W. Crandall, reads as follows:

"Rough Rice Purchase Contract.
"Standard Rice Co., Inc.
"Stuttgart, Ark., 4/27/1933.

"No agreements other than those in this contract will be recognized by us.

"Purchased from H. D. Dilday & W. W. Crandall.
"P. O. address, Stuttgart, Ark.
"In accordance with the terms printed below.
"Shipping point, rice mill.
"To be graded at mill.
"To be delivered on or before 10 days.
"Rough Rice as Below

Cup weight

| | | | |
|---|---|---|---|
| "_____Bus. | Edith No._____ | _____@_____per bus. 45 lbs. | |
| "_____Bus. | Fortuna No._____ | _____@_____ " " " " | |
| "_____Bus. | L. W. No._____ | _____@_____ " " " " | |
| "_____Bus. | Japan No._____ | _____@_____ " " " " | |
| "_____Bus.Blue Rose No._____ | | _____@_____ " " " " | |
| " 500 Bus. | E. P. No. 1 | 39@45c " " " " | |

"Terms of sale, as per sample or samples_____

"Conditions of Sale

"The rice listed hereon shall be delivered within the time stated. All rice to be threshed dry. In the event of rains or other unavoidable contingencies preventing the delivery of this rice in the time specified, the purchaser shall have the option of taking, but shall not be obliged to take said rice when same is ready for delivery. Delivery to be made to purchaser at its mill in Stuttgart,

Arkansas, unless otherwise directed by purchaser before shipping; purchaser to pay transportation charges from point of shipment and to direct routing unless otherwise stated.

"Seller warrants good, clear, unencumbered title to said rice, free of all claims and liens, and will defend buyer against all claims.

"The above is correct.

"(Signed) H. D. Dilday, Owner.

"B498

"(Signed) J. K. Carr, For Standard Rice Co., Inc."

There was written on the face of each of these sales contracts before they were signed these phrases: "To be milled on toll—These prices guaranteed."

Now all the parties agree that the signing of the sales contracts, one of which is set out above, was not the last thing to be done to evidence the complete and entire contract. A letter was to be written which would evidence the time during and for which the guaranty was effective.

Mr. Dilday testified that he received this letter the day after it was written, but that he did not read it until May 1. It reads as follows:

"Standard Rice Company, Inc.

"Stuttgart, Ark., April 27, 1933.

"Messrs. H. D. Dilday, Homer Dilday and W. W. Crandall,

"Stuttgart, Ark.

"Gentlemen:

"In consideration of your executing contracts on this date with the undersigned for rice as set forth, in rough rice contracts numbers 496, 497 and 498, respectively, copies of which you have, we hereby agree that in the event the farm bill now before Congress shall become a law on or before May 31, 1933, and in the event that by virtue of the terms of any such law there will be due and accruing to growers under terms of said law any tax or benefit that would be due you, or either of you, if you had held your rice until the passage of said law and sold the same immediately thereafter, that we will pay

the amount thereof to you as soon as it can be ascertained of authoritative sources the amount due.

"Yours very truly,
"Standard Rice Co., Inc.,
"G. B. Cummings."

The three written sales contracts and the letter last mentioned and quoted constitute the entire contract between the parties.

Appellant seeks to avoid a recovery by appellees upon the theory that the contracts are plain and unambiguous, and, when properly construed, mean that there was a completed sale of the rough rice upon delivery, and that no recovery can be sustained because no direct benefits accrued to appellees by reason of the Federal legislation which was in the minds of the parties at the time. Appellees contend in support of the recovery that the contracts are ambiguous as held by the trial court, but, if not ambiguous, they evidence only a conditional sales contract not to become fully executed until the Federal legislation was passed which occurred on May 12, 1934, and, in addition thereto, any benefits or gratuities which might be accorded to producers by reason of such legislation. The recovery in the trial court was measured by the enhancement of the market value of the rough rice from the date of the sales contracts up to May 12, 1934, the date on which the Federal legislation was enacted. The sustaining of appellant's theory will result in reversing and dismissing the case and the sustaining of either theory advanced by appellees will result in an affirmance.

It is elementary that all preliminary negotiations leading up to a written contract are merged into it when executed. 6 R. C. L., p. 839, § 228, and cases there cited.

A fair interpretation of the three written contracts and the letter in connection therewith creates no ambiguity.

The written-in portion of the contracts, namely, "to be milled on toll—prices guaranteed," if in conflict with other provisions must prevail and control. *Planters' Cotton Oil Co.* v. *Columbia Cotton Oil Company*, 126 Ark. 19, 189 S. W. 166. When the written-in provision

of these contracts is accorded their rightful importance and interpretation and construed together with the letter and all other provisions of the written contracts, they mean that the sellers of the rough rice retained title thereto until May 31, 1934, or until the Federal legislation in the minds of the parties was enacted or defeated, and that, in the event a gratuity or benefit was legislated in favor of the producers of such rice prior to May 31, 1934, the seller would be entitled thereto in addition to the rise in the price of rough rice upon the market. Any other interpretation of this letter would be in direct contradiction of the plain terms of the written contracts, and moreover would permit an *ex parte* letter of one of the parties to override and destroy the manifest intention of the contracting parties as expressed in their written contracts of sale.

The conclusion heretofore stated is irresistible when we accord the phrase, "to be milled on toll—prices guaranteed," its usual and ordinary acceptation. The word, "toll," is defined by Webster's New International Dictionary as, "the portion of grain taken by a miller as his fee." 62 C. J. 1078, defines "toll" as follows: " 'Toll' may be employed to designate a compensation or payments in markets or fairs for goods, cattle, etc., bought and sold. * * * A reasonable sum of money due to the owner of the fair or market upon the sale of things tollable within the fair or market, or, for stallage, piccage or the like."

Moreover, it was conceded by both appellant and appellees in oral argument before us that the phrase, "to be milled on toll—prices guaranteed," standing alone, meant that the title to the rice remained in the sellers until it was milled and the product otherwise disposed of. This admission seems to coincide with all legal definitions of the language employed.

Under the views stated it was the duty of the trial court and he should have, as a matter of law, instructed the jury to return a verdict in favor of appellees for the enhancement of the market price of rough rice from the date of the contracts of April 27, 1934, up to and un-

til May 12, 1934. Therefore there was no prejudicial error in submitting this question to the jury.

The motion for rehearing must be sustained, and the foregoing opinion is adopted as the opinion of the court.

SMITH, MEHAFFY and BAKER, JJ., dissent.

SMITH, J., (dissenting). It appears certain that, but for the insertion of the phrase, "to be milled on toll, these prices guaranteed," there was nothing about which there could have been any litigation. The three "Rough Rice Purchase Contracts," each representing a separate sale, read in connection with the letter of April 27, 1933, as the majority concede they must be, make complete and unambiguous written contracts for the sale of the rice. The letter is a part of each of the three Rough Rice Purchase Contracts and must be read as a part of each of them. The contracts are therefore identical in terms and are in effect a single contract. As no one questions this statement, it may be assumed to be true.

These writings evidence a completed sale under which the title passed, and nothing remained to be done except to classify, weigh and pay for the rice. That these writings were intended to pass the title and that they had this effect is shown not only by the unambiguous language which these writings employ, but by conduct of the parties pursuant thereto. The rice was delivered at the places designated and within the time limited. It was classified and weighed and paid for. Accounts of sale, called "settlement sheets," were offered in evidence without objection, covering the rice mentioned in the contracts of sale. These show that the rice—all of it except that owned by H. D. Dilday individually—was delivered on the 29th day of April and on the 1st of May. The intervening day was Sunday. The delivery of the H. D. Dilday rice began on April 28 and was completed April 29. These "settlement sheets" contain a detailed and comprehensive statement of the transaction. They are dated May 5, and evidence what purports to be a settlement in full. The purchase price, as shown by these accounts of sale, was paid in full. How, then, can it be said, not only in the face of these unambiguous writings but also in view of the conduct of the

parties in delivering the rice, having it classified, weighed and paid for as shown by the unambiguous "settlement sheets," that the title to the rice had not passed?

It is said that the phrase, "to be milled on toll, these prices guaranteed," standing alone, meant that the title to the rice remained in the sellers until it was milled and the product otherwise disposed of. But this language does not stand alone, and the product has been otherwise disposed of. It has been delivered at the time and place designated, has been classified and weighed and paid for. The only question in the case is the one of fact, not whether the title has passed, but whether the purchase money actually paid was all to which the rice owners were entitled. It is not questioned that the rice growers were paid everything to which they were entitled under the Rough Rice Purchase Contracts unless the phrase, "to be milled on toll, these prices guaranteed," entitled them to something additional.

I copy all of the testimony found in the transcript relating to this phrase.

II. D. Dilday was interrogated by his attorney as follows:

"Q. What did he put on those purchase slips, in addition to the price that he was paying you at that time? A. He says: I will have to put on them, 'Toll mill price.' Q. Does it say, To be 'Toll mill price'? A. Yes, sir. He said that that had to be written in there to make it legal." No other testimony was offered as to the meaning of the phrase, "to be milled on toll," by Mr. Dilday or his son, or his son-in-law. The only other testimony relating to these phrases was brought out in the cross-examination of Mr. Carr as follows: "Q. Who wrote this across the slip: 'To be milled on toll price guaranteed.' Did you write that across the face of that slip? A. Yes, sir. Q. You didn't say that it was to be a guarantee according to your letter of April 27? A. I didn't think that was necessary. Q. You had it there and that could have been written in there? A. Yes, sir."

No testimony was offered explaining these trade terms, but appellant in its brief makes the following explanation of them: "The term, 'to be milled on toll,'

has a well-defined meaning. Under a toll milling contract the rice is to be milled for the account of the grower. The miller is to mill and market the rice and account to the grower for the clean rice market price less the toll milling charge.'' The ''settlement sheets'' accord with this construction of the phrase and show conclusively that the sale was not contingent or conditional.

Every one agrees that a letter was to be written, which, when written, was to be a part of the contract of sale. But why and for what purpose? Now, these contracts were executed in contemplation of the legislation pending in Congress. None of the parties knew the provisions of the proposed legislation, but Mr. H. D. Dilday admitted that he ''was hoping that it (the bill) would raise the price of rice and the rice farmers would receive the same benefits as the cotton farmers.'' This letter was therefore written for the purpose of defining what the sellers might expect in addition to the guaranteed minimum prices and the time during and for which the guaranty was effective. No other reason existed for writing it, and when this letter, which explains what sums, if any, in addition to the guaranteed minimum prices are to be paid, is read as a part of each contract of sale, we have writings which are too plain to be explained away.

This letter recites that, in consideration of the execution of the ''Rough Rice Purchase Contracts,'' the rice company assumes an obligation in addition to that recited in those writings, and, when we have determined what that obligation is, we have the solution of the only question in the case and which solution should determine it.

Now this additional obligation is assumed in the event only that the farm bill then before Congress should become a law on or before May 31, 1933. But, if so, then what? Let the letter answer. ''In the event that by virtue of the terms of any such law there will be due and accruing to growers, under terms of said law, any tax or benefit that would be due you, or either of you, if you had held your rice until the passage of said law and sold the same immediately thereafter, we will pay

the amount thereof to you as soon as it can be ascer tained of authoritative sources the amount due.''

This letter, which, as all agree, is a part of the contract, does not say that if the Farm Bill should become a law on or before May 31, 1933, that the purchaser will pay the increased market price of the rice, as the plaintiffs contend the defendant Rice Company had agreed to do. The obligation in the case stated is to pay the amount of any tax or benefit which the owners would have had by virtue of the law if they had held their rice until its passage and sold the same immediately thereafter.

This payment was to be made as soon as the amount thereof could be ascertained from authoritative sources. Had this sum meant the difference in market value, as plaintiffs contend, that difference could have been ascertained by inquiry at any rice market (and the place of the sale of the rice here in question was one of the largest of these) without the delay of any application to authoritative sources for that information. The authoritative sources referred to are the governmental agencies which would be charged with the administration of the law. Mere differences in market value could have been ascertained immediately and from many sources.

The parties have entered into the following stipulation: ''It is agreed between counsel for the plaintiff and counsel for defendant that the defendant, Standard Rice Company, Inc., is a foreign corporation, authorized to do business in the State of Arkansas; that the letter of April 27, 1933, signed Standard Rice Company, which is addressed to plaintiffs, refers to the Agricultural Adjustment Act of Congress; that the act does not carry or provide any benefits or fix any price of rice to rice growers; that that act is the same act referred to in plaintiff's complaint.'' This stipulation is conclusive of the fact that the Agricultural Adjustment Act, which finally became a law on May 12th, did not carry or provide for benefits or fix any price to rice growers as was done in the case of cotton and other farmers. As this was the additional payment to which the letter referred, there should be no recovery of any excess over the guaranteed minimum price which was fully paid on May 5th.

764

The delivery of the rice was completed on May 1st, and Mr. Dilday says he had not read the letter before that day. Even so, it was his duty to read it. It was dated and mailed May 27th and addressed to a man who lived in the town where it was mailed. But little, if any, of the rice was delivered before its receipt. Mr. Dilday knew the purpose of the letter was to declare, and to place in writing, the terms upon which the rice company proposed to buy, and it binds as fully as if it had been read. This is elementary law. The cases of *Allen* v. *Thompson,* 169 Ark. 169, 273 S. W. 396, and *Iron Works* v. *Douglas,* 49 Ark. 355, 5 S. W. 585, are conclusive of the point.

If there were any doubt about the letter of April 27, 1933, being a part of the contract, a letter written by plaintiffs on October 11, 1933, would dispel it. This letter reads as follows:

"Gentlemen: I call your attention to your letter of April 27, 1933, which explains itself. As it is now definitely known what the balance is due under our contract of the above date, we respectfully ask that you now make payment on the balance due."

This letter is plainly a demand for the excess price to which the letter of April 27th related. It is a recognition of the fact that any recovery must be based upon this letter, as it stated the terms upon which the Rice Company was willing to buy the rice. Mr. Dilday, Sr., has not always, however, construed the letter of April 27th as he construed it in his own letter of October 11th. This is shown by his attempt to evade the effect of the letter of April 27th by stating that he did not read it until May 1st, at which time the rice had been delivered. Dilday, Jr., testified that he did not hear the letter read until May 5th, the day on which the settlement was made. Mr. Dilday, Sr., testified that he called to the attention of his son that the letter did not express the agreement which they had with Carr. He was asked: "Q. You didn't notify the defendant company that this letter wasn't what the agreement was you had with Mr. Carr?" He answered, "No, sir." His own attorney then asked him: "Q. State to the jury why you didn't notify the

company." He answered: "A. I had already made the agreement with Mr. Carr and I thought that that was understood." "Q. That you were to receive any benefits of any rise that might take place up to May the 31st?" He answered: "A. Yes, sir." In other words, the attempt now is to construe the letter of April 27th not in accordance with its language, but to conform to Mr. Dilday's recollection and interpretation of his conversation and preliminary agreement with Mr. Carr. The rule of evidence designed to give value to written contracts by excluding parol testimony which contradicts them should prevent this from being done. I think the letter of April 27th is conclusive of the rights of the parties, and that plaintiffs were paid on May 5th everything to which the letter entitled them.

I therefore respectfully dissent, and am authorized to say that Justices MEHAFFY and BAKER concur in the views here expressed.