BEWIGGED BY SUZZI, INC., APPELLANT, *v.* ATLANTIC DEPT. STORES, INC., ET AL., APPELLEES.

(No. 34640—Decided July 1, 1976.)

Messrs. *Reminger & Reminger* and *Mr. William V. Valis*, for appellant.
Mr. *Charles M. Rosenberg*, for appellee.

JACKSON, J. The appellant is a corporation engaged in the business of selling wigs to retail customers. At trial it was stipulated that Atlantic Department Stores, Inc., is the only defendant and that the names used to identify other purported defendants were simply other names under which appellee conducted its business of operating discount department stores. Prior to November 15, 1973, appellant was conducting its business from the premises of eight different Atlantic Department Stores located in various parts of northern Ohio. On that date the appellee seized the inventory and fixtures of the appellant in all eight locations. When the appellant complained about the seizure, the appellee stated that the seizure was made pursuant to the provisions of a 1970 license agreement under which it claimed a lien upon the property seized for the payment of "rent" which was alleged to be in arrears. After the parties had been unable to resolve their dispute, plaintiff appellant commenced this action on March 27, 1974, by filing

a complaint in replevin and conversion in the Cuyahoga County Court of Common Pleas. By that action appellant sought to recover its goods or, in the alternative, to receive $16,129.39 as damages for the loss of those goods; an additional amount of $30,337.42 as damages for the loss of the use of the property in question; and $100,000 for punitive damages.

On April 8, 1974, appellee filed an answer denying any wrongful conduct on its part, and a counter-claim demanding $10,550 from appellant as payment for monies due under the license agreement. After pre-trial negotiations the seized property was returned to plaintiff appellant and $3,000 was settled upon as the sum due under the license agreement for "rent" in arrears. On February 24, 1975, a trial was had without a jury upon appellant's claims of, wrongful seizure of the property in question; damages in the amount of the claimed loss of value to the property while in the hands of the appellee; and a request by appellant for punitive damages. The trial court granted judgment for the defendant appellee upon plaintiff's complaint and judgment for the defendant appellee upon the counterclaim by defendant appellee in accordance with the previous agreement. From that judgment the appellant has assigned four errors which are as follows:

"1. The Court erred in holding plaintiff corporation bound by the provisions of the License Agreement, where said agreement was made between defendant and plaintiff corporation's sole shareholder in her individual capacity, by treating the corporation and the shareholder as one and the same entity.

"2. The Court erred in finding that the provision of the License Agreement creating a lien in favor of the Licensor, on Licensee's property, authorized Licensor's taking of plaintiff's property without notice, hearing or court order.

"3. The Court erred in granting defendant's Motion to Quash plaintiff's subpoena duces tecum requesting the defendant to produce recent profit and loss statements and balance sheets showing all of the assets of the defendant.

"4. The judgment of the Court was contrary to the weight of the evidence."

We overrule the third assignment of error by appellant for the reason that the prejudice of alleged error has not been demonstrated. With respect to the other assignments of error, we find each meritorious as set forth below.

I.

On August 25, 1970, a document entitled "License Agreement" was executed between two parties identified as a licensor and a licensee. The document discloses that the licensor was Spartan Department Stores, Inc., which is one of the names under which appellee conducts its business. The licensee was C. S. Brunetti, who was established by testimony at trial as the president and sole shareholder of plaintiff appellant corporation.

Both the license agreement and the attached rider state that the license agreement was between Spartan Department Stores and Carolyn Sue Brunetti. It was executed as follows:

"Spartan Department Stores
By: S/Edward L. Friedman
Carolyn Sue Brunetti
By: S/C. S. Brunetti"

Paragraph 32 of that license agreement provided that the licensor was to have a "* * * first lien upon and shall be a preferred creditor with respect to all of the stock, fixtures, equipment and other property owned by Licensee or located on the premises for all sums due from Licensee to Licensor hereunder, whether for minimum or percentage payments, or otherwise."

By its own terms that agreement expired on September 1, 1971.

Without regard to whether the August, 1970 license agreement was such as to make Ms. Brunetti or Bewigged by Suzzi, Inc., the licensee,[1] we hold that under the com-

---

[1]The trial court incorrectly determined that the separate corporate entity could be disregarded simply because Ms. Brunetti was the President and sole stockholder of the plaintiff appellant corporation. Ohio

mon law relating to licenses and Article 9 of the Uniform Commercial Code as adopted in Ohio, that the appellees, on November 15, 1973, held no enforceable lien against either Ms. Brunetti or BeWigged by Suzzi, Inc.

Under Ohio law a license has been defined as ·

"* * * a permission to do some act or series of acts on the land of the licensor, without having any permanent interest in it; it is founded on personal confidence, and is not assignable. It may be given in writing or by parol; it may be with or without consideration, but in either case it is usually subject to revocation, though constituting a protection of the party acting under it until the revocation takes place." *Fairbanks* v. *Power Oil Co.* (1945), 81 Ohio App. 116, 123.

A license may be created either by express or implied agreement. While it always confers a privilege which is in some way connected with the use of land, that use of the land is clearly incidental to the main purpose of the license. *Burby, Real Property,* Section 38 (3d ed. 1965). Unlike a lease, a license gives the licensee no estate or other interest in land. As expressed by the Ohio Supreme Court, the major difference between a license and a lease is:

"1. A license to do an act upon land involves exclusive occupation of the land by the licensee so far as is necessary to do the act and no further, whereas a lease gives the right

---

law does not prohibit an individual from owning all of the stock of a corporation and still enjoy the standard benefits that accrue to all other stockholders and corporations under the statutes. Courts will, in certain circumstances, disregard the legal fiction of the separate entity of the corporation. But this is an action that can be taken only in unusual situations where such measures are necessary in order to prevent fraudulent or illegal actions, *e. g., First Nat. Bank of Chicago* v. *Trebein Co.* (1898), 59 Ohio St. 316; *Khoury* v. *Bd. of Liquor Control* (1957), 74 Ohio Law Abs. 492, or when the stockholder himself has disregarded the separate corporate entity and treated the business of himself and that of the corporation as one in the same. *See generally, Annot.* (1972), 46 A. L. R. 3d 428. In this instance the trial judge prevented the parties from presenting any evidence that would be relevant to making a determination as to whether the corporation would or should not be respected as a separate and distinct entity. Accordingly, the record before us contains no evidence which would justify a "piercing of the corporate veil."

of possession of the land and the exclusive occupation of it for all purposes not prohibited by its terms." *Direnzo* v. *Cavalier* (1956), 165 Ohio St. 386.

*Accord, Pitts* v. *Housing Authority* (1953), 160 Ohio St. 129, Syl. 2; *Ohio Valley Advertising Corp.* v. *Linzell* (1957), 107 Ohio App. 351.

A further distinguishing feature is the difference in the expected duration of a tenancy as opposed to a license. Under property law there is an estate identified as a tenancy at will, which is terminable at the will of either the landlord or the tenant. Unless, however, there is an agreement specifically stating that the tenancy is one at will, the common law rules will change this tenancy into a peridoic tenancy based upon the periodic payments the tenant makes for his rent. Thus, in dealing with leasehold estate, the estate will be initially terminable only upon the expiration of a specific period of time, unless the parties specifically make an agreement to the contrary. *See generally Burby, Real Property*, Sections 48-51 (3d ed. 1965). The rule is exactly the opposite in licenses, where a license is terminable at will unless the parties specifically provide to the contrary *and* the licensee holds a license coupled with an interest. *See Fowler* v. *Delaplain* (1909), 79 Ohio St. 279; *Callaghan* v. *Callaghan* (1926), 25 Ohio App. 96.

In the instant case the document under which the defendant appellee claims the right to possession of the inventory and fixtures was termed a license agreement. It consistently referred to Spartan Department Stores, Inc., as the licensor and to Ms. Brunetti as the licensee. It did not purport to grant Ms. Brunetti any interest in the premises, but only indicated that the license was being given to allow her to establish a wig department for the purpose of selling wigs. The attachment to the agreement specified designated amounts of space to be utilized by Ms. Brunetti in the various stores, but did not set aside specific portions of the store for her use. It made no provision for any acts by Ms. Brunetti upon the premises of any store, other than for the sale of wigs. With the facts in this posture we hold that the agreement was, in both form and substance, a license agreement.

Though that agreement expired on September 1, 1971, the defendant appellee argues that the appellant was a "holdover tenant" and, citing landlord-tenant cases, contends that on September 1st each year the license was extended for the term of an additional year by appellant's action in remaining on the premises. Unfortunately, neither of the parties has addressed themselves to the issue of whether there can be a "holdover licensee" or whether a license agreement for a period of time can be extended for an identical period by the "holding over" of the licensee. In spite of the lack of any presentation of cases dealing with licenses upon this issue, the appellant implicitly asks this court to utilize the cited landlord-tenant cases and to make a similar "holdover" rule apply to licenses. This we decline to do.

As set forth above, the interests of the holder of a lease and the holder of a license vary greatly. Unlike the lessee the licensee has no interest in the property itself, and a license is presumed to be terminable at will unless an agreement to the contrary is shown and supported by consideration. On the other hand, leases and other tenancies, unless specifically agreed to, are deemed to exist at least from period to period. Consequently, we conclude that different policy considerations apply and that the nature of a license does not warrant an expansion of the law which would curtail the presumption of revocability by providing that if a licensee continues to utilize privileges formerly enjoyed under a license agreement after termination, such agreement is automatically extended for an equal period of time.

In this instance, we are unable to ascertain the status of the appellant prior to September 1, 1971. If the corporation was actually a party to the written license agreement then it was an express license. If the corporation was not a party to that agreement then they would have acquired the status of a licensee by implication by failure of Atlantic Department Stores, Inc. to object to its presence.[3] We

[3]The general rule is that licenses are not assignable, unless specifically provided in the license agreement. Since no such provision was contained in the agreement, the corporation could not have validly received an assignment or "sub-license" from Ms. Brunetti.

find, as a matter of law, that *after* the termination of that agreement the appellant corporation was a licensee by implication. As such, it was under only such obligation as could fairly be implied from the conduct of the parties. Since the record fails to evidence any conduct after September 1, 1971, which would in any manner suggest that the appellant had given the appellee a lien upon its property, none could be said to exist and, consequently, appellee was without the legal right to seize the property of appellant on November 15, 1973.

## II.

Even if it were assumed, *arguendo*, that under the common law relating to licenses a lien could be implied as one of the conditions of the 1973 implied license between the parties, this result would be prohibited by Article 9 of the Uniform Commercial Code as adopted in Ohio in R. C. 1309.01, *et seq.* Since the appellee claimed a lien upon appellant's inventory and fixtures in order to secure debts for moneys due under the license agreement, its claim was a claim of a security interest under R. C. 1301.01(KK) (UCC1-201 (37)), which defines a security interest as "an interest in personal property or fixtures which secures payment or performance of an obligation." Under R. C. 1309.02(A)(1) (UCC 9-102(1)) the provisions relating to security interest apply, *inter alia,* "to any transaction, regardless of its form, which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, accounts or contract rights * * *."[3] The requisites for acquiring such a security interest are set forth by R. C. 1309.-14(A)(2) (UCC 9-203), which provides, in relevant part, that:

"(A) * * * a security interest is not enforceable

---

[3] R. C. 1309.04 excludes certain transactions from the operation of R. C. 1309.01 to 1309.50, inclusive. Among the exclusions in the model provision (UCC 9-104) is one applying to a "landlord's lien." But this exclusion was not adopted by R. C. 1309.04 when it incorporated the other UCC provisions. No such exclusion under the UCC exists for security interests brought into existence in conjunction with a license.

against the debtor or third parties unless * *.*

"(2) the debtor has signed a security agreement which contains a description of the collateral * * *."

The impact of this provision is explained by Comment 5 to R. C. 1309.14, which states:

"The formal requisites stated in this section are not only conditions to the enforceability of a security interest against third parties. They are in the nature of a Statute of Frauds. Unless the secured party is in possession of the collateral, his security interest, absent a writing which satisfied division (A)(2), is not enforceable even against the debtor and cannot be made so on any theory of equitable mortgage or the like. * * *"

Similarly, under R. C. 1309.15(A) (UCC 9-204), "[a] security interest cannot attach until there is agreement * * * that it attach and value is given and the debtor has rights in the collateral. * * *"

These provisions are exclusive in nature. The appellee could not acquire an enforceable interest in the property in question in any other manner. In this instance the appellee acquired an enforceable security interest against its original licensee—whether that be Ms. Brunetti, or BeWigged by Suzzi, Inc. By its own terms that security agreement terminated on September 1, 1971. There are no provisions in the commercial statutes of Ohio that would provide for the automatic extension of the life of a security agreement. Once that security agreement had lapsed, the appellee could acquire another security interest in the inventory and fixtures in question *only* by another security agreement signed by the debtor and describing the collateral. This the appellee failed to do. It therefore had no enforceable lien, and no corresponding right of possession of the property seized.

For these reasons we affirm the judgment of the court below with respect to the disposition of the counterclaim of the defendant appellee; we reverse the judgment of the trial court in which it held that the defendant appellee did not wrongfully seize the property of the appellant and enter judgment for the plaintiff appel-

lant⁴;, and we remand for further proceedings the determination as to the amount of damages to which appellant is entitled as a result of defendant appellee's wrongful seizure of its property and the issue of whether plaintiff appellant is entitled to punitive damages and, if so, in what amount.

*Judgment affirmed in part, reversed in part, and cause remanded.*

DAY and CORRIGAN, JJ., concur.

---

⁴Even if we had found the defendant appellee had legally taken possession of appellant's property, we would be compelled to reverse and remand the case for a further determination of whether appellee's action in seizing the property and maintaining it as they did was "commercially reasonable" within the meaning of R. C. 1309.47 (UCC 9-504). For authority for the proposition that the doctrine of commercial reasonableness applies to possession as well as disposition, see *Farmers State Bank of Parkston* v. *Otten* (S. D. 1973), 204 N. W. 2d 178; *Michigan National Bank* v. *Marston* (Mich. Ct. App. 1970), 185 N. W. 2d 47; White & Summers, Handbook of the Law Under the Uniform Commercial Code (1972), 998, n. 152; Annot. (1974), 55 A. L. R. 3d 651, 653. *See also, Jones* v. *Morgan* (Mich. Ct. App. 1975), 228 N. W. 2d 419; II Gilmore, Security Interests in Personal Property (1965), Section 44.1.