**William MARKS, et al., Plaintiffs,**

**v.**

**Larry POWELL, et al., Defendants.**

**Civ. No. LR–C–92–713.**

United States District Court,
E.D. Arkansas, W.D.

Aug. 20, 1993.

See also, 135 B.R. 344.

David Nixon, Fayetteville, AR, Robert Gross, Little Rock, AR, for debtors/plaintiffs.

Steve Shults and Baker Kurrus, Little Rock, AR, for intervenor.

## ORDER

GEORGE HOWARD, Jr., District Judge.

This matter comes before the Court for the entry of judgment pursuant to 28 U.S.C. § 157(c). On October 13, 1992, the bankruptcy court issued proposed findings of fact and conclusions of law with regard to the claim of First National Bank of Stuttgart ("the Bank") and the counterclaims of debtors William and Ellen Marks. The bankruptcy court recommends that the Court enter judgment for the Bank on five of the six claims brought by the Marks and that the judgment on the claim that the Bank did not dispose of the collateral in a commercially reasonable manner be entered in favor of the Marks.

The Marks filed objections to the bankruptcy court's proposed findings that there was no fraud on the part of the Bank and that the Marks' proof of damages was insufficient.

Pursuant to 28 U.S.C. § 157(c) and Bankruptcy Rule 9033(d), the Court is to conduct a *de novo* review of those matters to which any party has timely and specifically objected. The Court may accept, reject, or modify the proposed findings of fact, receive further evidence, or recommit the matter to the bankruptcy judge with instructions.

The facts in this case, while not complex, are extensive. The bankruptcy court discussed fully the dealings between the parties leading to this action, and they need not be repeated here. The Court notes that the trial lasted five days, and involved hundreds of exhibits. The Court has thoroughly reviewed the voluminous record.

The gravamen of Marks' complaint concerns the allegation that Waylan Wiggins ("Wiggins"), the loan officer with whom the Marks dealt at the Bank, lied to them, in particular that Wiggins promised Marks a $250,000 loan for their 1989 operating expense.

The record reveals that at the end of 1988, the Marks had the opportunity to purchase a second farm (the "Day Farm.") The Marks' obligation to the Bank, at that time, had grown to $467,000.00. Nevertheless, Wiggins promised to provide operating expenses of up to $250,000.00 in 1989. The most, at any one time, which would be loaned was $50,000.00.[1] This was accomplished through an open end note of $50,000.00, which the Marks agreed to and signed.

The Court cannot find that Wiggins or the Bank fraudulently misrepresented the nature of the financing that would be available to the Marks. Even the Marks did not claim that the Bank was to lend them the $250,000.00 in one lump sum. The Marks testified that they were to receive five loans of $50,000.00 each at various times. They were not clear as to when the money would be lent to them, and seemed to assume that it would be available on an as needed basis. In fact, even though the original March, 1989, loan was an open-end note of $50,000.00, the record reveals that the Bank did loan additional money to the Marks during 1989, when they needed it and that by the end of the 1989 the Bank had advanced over $260,000.00.

The Marks claim as a result of the misrepresentations concerning the financing they were unable to properly feed and care for their fish, they were forced to sell their fish before they were ready, and their business was destroyed.

The Court agrees with the bankruptcy court that the proof of damages is insufficient, even assuming that Wiggins had misrepresented the nature of the financing. Given that the Marks did receive over $250,000.00 in 1989, the claim by Bill Marks that he did not have sufficient money to feed the fish is not credible. In fact, Marks agreed that he had money during over half of 1989 for fish food.

---

1. Harry Pace, the FmHA County Supervisor, and a disinterested witness, testified that at a meeting he attended with Wiggins and the Marks, that there was discussion about the amount of money the Marks would need to operate in 1989. Although the individuals discussed $250,000 in operating expenses, Pace stated that Wiggins made it clear to the Marks that the most the Marks could have outstanding at any one time was $50,000.00.

Because the Marks did not have any records to support a claim for lost profits, the expert who testified on their behalf did not have complete records on which to form an opinion. He relied merely on the stocking records, which show only the fish that are planted. The Marks did not keep bills of sale, receipts, or other documents showing how much money they received for the fish they did sell. The figures presented for lost profits were not only speculative, but based on incomplete or erroneous data.[2]

■ The Marks ask that the record be reopened to consider the testimony of Neil Maynard, the Bank's president and Chairman of the Board during the time the events occurred. The Court has reviewed the affidavit and is not persuaded that the record should be reopened to take additional evidence.

At the outset, the Court notes that the Marks have not demonstrated good cause for why Maynard's testimony could not have been secured for trial. That Maynard "made himself unavailable during both the preparation and prosecution of this case, and hence, was unavailable to testify at either deposition or trial" does not establish good cause. It does not appear that the Marks sought the bankruptcy court's assistance in compelling the attendance of Maynard at either a deposition of trial.

Furthermore, Maynard's purported testimony, as provided in the affidavit, would not change the results of this case. Even assuming that Maynard would testify that the Bank surreptiously "strung" the Marks along until the money from the FmHA came through, the evidence would contradict him. As noted above, the Bank continued to lend the Marks money through 1989, in an amount in excess of their projected operated costs. Thus, the evidence does not support the assertions by Maynard.

In addition, the purported testimony by Maynard in no way overcomes the insufficient evidence of damages, even assuming the misrepresentations. Thus, the Court is not persuaded that the record should be reopened for additional evidence.

After a *de novo* review of the entire record, and consideration of the Marks' objections, the Court finds that the bankruptcy court's proposed findings of fact and conclusions of law should be adopted and are hereby adopted in their entirety. Judgment will be entered accordingly.

IT IS SO ORDERED.

### *JUDGMENT*

In accordance with the order entered this date, the proposed findings of fact and conclusions of law issued by the bankruptcy court on October 13, 1992, are hereby adopted in their entirety. Judgment is entered in favor of the plaintiffs on Count V of the Counterclaim to the Complaint in Intervention. All other counts of the Counterclaim are hereby dismissed.

IT IS SO ORDERED.

IN THE UNITED STATES
BANKRUPTCY
COURT

FOR THE EASTERN DISTRICT
OF ARKANSAS

WESTERN DIVISION

In re William H. MARKS, Jr. and

Ellen B. Marks a/k/a

Marks Farms.

William and Ellen MARKS, Plaintiffs,

v̇.

Larry POWELL and Stella
Champion, Defendants,

First National Bank in Stuttgart,
Intervenor.

Bankruptcy No. 90–50495 S.

Adv. No. 91–5001.

### *PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR ENTRY OF JUDGMENT PURSUANT TO 28 U.S.C. § 157(c)*

MARY D. SCOTT, Bankruptcy Judge.

THIS CAUSE came before the Court upon the trial on the counterclaim to the complaint

---

**2.** While hard workers, the Marks were not particularly successful business people. During the over twenty years the Marks had operated business, they had lost money in all but one or two of those years.

in intervention. The debtors instituted the adversary proceeding by filing a complaint for turnover seeking recovery of equipment and fish planted on the defendants' land. The First National Bank in Stuttgart ("the Bank") was granted permission to intervene in order to assert its security interest in the equipment and in the fish. The debtors counterclaimed against the Bank on numerous grounds. When the adversary proceeding was called for trial, the defendants Champion and Powell were dismissed from the suit and trial proceeded on the counterclaim against the intervenor Bank. There is no dispute that the Bank has a secured claim to the extent of the value of the equipment and fish.

The counterclaim stated six counts. Counts I, II, III, and IV related to alleged promises by the Bank to ensure funding for the debtors' fish farm. These counts sounded in contract, breach of the duty of good faith, and fraud based upon the failure of the Bank to provide operating funds for the fish farm. Count IV stated a claim for equitable subordination under section 510 of the Bankruptcy Code. At the conclusion of the debtors' case, the Court granted the Bank's motion to dismiss these claims, but permitted the case to go forward on Count V which alleged that the bank failed to act in a commercially reasonable manner in the disposition of the debtors' equipment and fish.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), 1334. However, this Court concludes that this is not a "core proceeding" within the meaning of 28 U.S.C. § 157(b). Accordingly, judgment must be entered by the district court. 11 U.S.C. § 157(c).

### The Farm

The debtors are husband and wife who operated a fish market in Stuttgart, Arkansas. When the fish market became successful, the Marks attempted to expand into the fish farming business. The fish farm was not successful, forcing the Marks to file bankruptcy.

Beth Marks has a high school education. Bill Marks was educated through the eleventh grade, but cannot read or write. He can sign his name and perform some mathematical calculations. His wife read all of the loan and other documents involved in this case to him. The Marks have generally lived off of the proceeds of two farms which Bill Marks inherited. One of the farms consisted of approximately five to six hundred acres in Arkansas and Prairie Counties, which was sold in or around 1980. The other farm consisted of approximately six hundred acres in Jefferson County and was sold in 1982 or 1983 for approximately $700,000. The Marks spent the proceeds from the sale of those farms in their businesses and on their living expenses.

In 1987, having operated a fish market in Stuttgart, Arkansas, the Marks endeavored to raise fish for human consumption—food fish farming. The Marks talked to various people and made efforts to learn about fish farming before they began. In early 1987, the Marks borrowed money from the Bank for use in their fish farming business. On April 2, 1987, the Marks signed a promissory note to the Bank and obtained a line of credit in the amount of $150,000.

The Marks leased a farm of approximately 520 acres called the Champion Farm, which had approximately fifty fish ponds on it. The rental payment was $16,000 per year, due on April 1 of each year. The Marks began preparing the ponds on the Champion Farm in the spring of 1987, "planting" fish and stocking various reservoirs known as the Hargrove Reservoir, the Ives Reservoir, the Grant–Howey Reservoir, the Bill–Jamie Reservoir, the Lagrue Land Reservoir, the Capps Reservoir, and the Timberview Reservoir. The principal varieties of fish stocked by the Marks were catfish, bighead carp, and grass carp. During 1987, the Marks worked hard and the farm appeared to be doing well.

On December 22, 1987, Bayou Meto, which runs next to the Champion Farm, flooded virtually all of the Marks' fish ponds. They lost nearly all of their fish on the Champion Farm. When the water receded, the situation was worse than when they had started. They had to start completely over with the operation and do even more preparatory work and incur more start up expenses than

they had the first time. They salvaged some fish, obtained an additional loan from the Bank, repaired levees, prepared the ponds again, and restocked the ponds.

During much of 1988, the Marks experienced worse problems than they had in 1987. The weather remained wet and cloudy much of the time such that they could not get a "bloom" on the ponds to produce vegetation for the fish to eat.

Waylon Wiggins ("Wiggins") was the Marks' principal loan officer at the Bank. Early in 1988, Wiggins learned that disaster relief in the form of low interest, long term loans would be available through the Farmers Home Administration ("FmHA") of the United States for farmers who had suffered losses because of the December 1987 flood. $500,000 was the maximum possible amount of relief available to a single farming unit. With the assistance of Waylon Wiggins at the Bank, the Marks applied for disaster relief. The application, review, and approval process lasted throughout 1988, during which the Bank continued to make additional loans to the Marks and to renew outstanding loans.

FmHA eventually communicated to the Marks through Wiggins that the disaster relief loan for which the Marks had applied would be limited to the value of real estate collateral which the Marks could pledge to secure repayment of the loan, which was a lesser amount than Wiggins had anticipated. In order to make possible a disaster relief loan in a substantial amount and to ensure payment of their own loans, the Bank gave up its first lien position on the Marks' house. With a pledge of the house and forty-eight acres of land which the Marks had purchased and on which they were fish farming, FmHA loaned the Marks $203,000. The Marks agreed that the FmHA loan proceeds would be applied to their debt to the Bank.

Early in 1989, the Marks purchased an additional fish farm known as the Day Farm with a loan from Farmers & Merchants Bank. The Day Farm had been an established fish farm. The Marks prepared the farm in the spring of 1989 and stocked it in the spring and summer of 1989.

On March 9, 1989, at the same time as the FmHA loan closing, the Marks signed a promissory note evidencing a $50,000 revolving line of credit. The note stated that the loan they received was a multiple advance, open-end credit with a maximum balance of $50,000. Under this line of credit, the Marks could receive advances up to the maximum balance of $50,000, make repayments as fish were sold, and, if cash flow needs required, receive additional advances up to the maximum balance of $50,000 again. The Bank made two additional loans later in 1989 to help the Marks pay expenses.

In April 1990, floods again invaded the Champion Farm and broke the levees. On June 1, 1990, frustrated with the difficulties wrought by weather and his dealings with the Bank, Bill Marks delivered the keys to the Day and Champion Farms to Wiggins. Wiggins returned the keys to Marks. On July 27, 1990, the Bank gave notice to the Marks that it intended to dispose of the fish and other assets upon which it had a security interest, pursuant to section 4-9-504 of the Arkansas Code.

### Disposing of the Day Farm Assets

On July 9, 1990, the Marks deeded the Day Farm to Farmers & Merchants Bank in lieu of foreclosure. On July 12, 1990, Wiggins obtained permission from Farmers & Merchants Bank to go onto the Day Farm to conduct an inventory of the fish and equipment located there. Wiggins was unable to determine the amounts, species and market value of the fish at the Day Farm. In order to dispose of the collateral, Wiggins hired Don Holland ("Holland") to seine and market the fish on the Day Farm. Wiggins and Holland agreed that Holland would begin seining ponds on August 1, 1990. Holland had neither the knowledge nor the equipment to properly seine the fish. In this time frame, Farmers & Merchants Bank sold the Day Farm to Bill Stephens, who was to take possession on September 1, 1990.

Holland advised Wiggins that oxygen in the ponds would be a problem, but Wiggins could not recall if Holland advised him how to prevent the fish from dying from lack of oxygen. Holland specifically told Wiggins

that someone would have to tend to the oxygen problem as soon as possible, but Wiggins took no action. The fish in two ponds died. Obviously, no proceeds were realized from these two ponds. Holland seined approximately 3,300 pounds of catfish from another pond. However, the truck in which he transported the fish was involved in an accident and all of the fish perished. Again, no proceeds were realized. Holland then abandoned the job.

The ponds on the Day Farm did not need to be drained in order to seine the fish. However, one or more of the ponds were drained by the Bank or its agents, killing all of the fish in those ponds. Again, no proceeds were realized from these ponds.

Wiggins contacted Max Vickers ("Vickers") on August 6, 1990, in an effort to obtain assistance in seining and marketing the fish. While Vickers would be responsible for expenses, the Bank retained authority on all marketing decisions. Vickers, a fish broker, was apparently "getting into the business" of fish farming. He purportedly knew how to seine fish and had equipment to do so. When asked if Vickers did a good job, Wiggins could only reply that, compared to Holland, he had better equipment. Wiggins later testified that Vickers did not have the equipment necessary to work the farms as demonstrated by the fact that the Bank had to loan Vickers funds to purchase the equipment. Further, there was testimony that Vickers had "no way" to seine the two large reservoirs of fish. Wiggins demonstrated throughout his lengthy testimony an uncanny ability to testify in the alternative: Wiggins also testified that Vickers in fact had "adequate" equipment to harvest the fish before the loan. Apparently cognizant that Vickers did not have sufficient experience or expertise to do the job, the Bank also hired Gilbert Voumard ("Voumard") to oversee seining operations. Voumard, a relative of one of the Bank's trust officers, was apparently hired because of his experience in the minnow business.

Seining of the Day Farm was conducted by Vickers in August 1990 and continued into September and October. Wiggins sometimes assisted Vickers in harvesting the fish. At one point, when seined fish were placed in vats, Wiggins failed to turn on the filtering system, killing all of the fish in the vats. On another occasion, when the fish were harvested, neither Wiggins nor Vickers thought to have a truck ready to remove them. Presumably, these fish also met an untimely end.

*Disposing of the Champion Farm Assets*

The owners of the Champion Farm refused to cooperate with the Bank and, accordingly, on July 18, 1990, the Bank filed suit in Chancery Court of Arkansas County, to obtain access to the Champion Farm. Pursuant to the court order, dated August 8, 1990, the Bank had only 30 days to seine the fish from the Champion Farm. However, Wiggins did not obtain the keys to the Champion Farm until August 24, 1990. No explanation was ever given why only thirty days had been obtained, why the keys were not obtained until August 24, or why the Bank did not immediately begin harvesting the Champion Farm once the keys had been obtained. In any event, as Bill Marks flatly stated, thirty days was not sufficient time to get the fish off the Champion Farm. This statement is corroborated by the fact Vickers spent a full week just plotting the numerous ponds on the Champion Farm.

Despite being given only thirty days to harvest on the Champion Farm, the Bank delayed in harvesting the fish on the farm. The Bank did not even enter the Champion Farm until August 30, 1990. Wiggins was "not sure" whether he advised Vickers of the very short time period they would have to harvest the fish on the Champion Farm. Vickers, aware that there was some sort of time pressure, nevertheless waited over a week to enter the Champion Farm because they were "gathering equipment" to harvest the fish.

The large reservoirs and ponds were not seined at all because the persons hired by Wiggins did not have the equipment to do so. No efforts were made to seine these ponds. No effort was made to contact anyone who had the capability of seining the large ponds. No efforts were made to harvest the Hargrove reservoir, the Grant, Lagrue, Capps, or Timberview reservoirs.

Finally, Wiggins also assisted in disposing of equipment on the Champion Farm. There were many lines of pipe connected to ponds all over the farm. Wiggins assisted in dismantling this pipe, breaking "some" of the connectors.

*The Motion to Dismiss: Lender Liability*

■ The Marks' counterclaim is based upon their assertion that sometime in 1988, Wiggins orally promised them that the Bank would lend them $250,000 to cover their operating expenses in 1989, in the form of a $250,000 line of credit. The Marks assert that they understood the loan was to be made in five installments or five separate loans of $50,000 each. The Bank denies the alleged oral agreement and asserts that Wiggins only discussed a revolving line of credit with a maximum balance at any one time of $50,000 which should have been enough to cover the projected operating expenses. Because the Marks provided no proof of a representation or promise to loan $250,000, the Court granted the Bank's motion to dismiss at the conclusion of the Marks' case.

Typically, cases which present this issue to the courts involve an allegation by a borrower that a bank agreed to make a loan for a certain amount, then failed to honor that agreement. Generally, there is no written document to evidence any agreement, and the borrower cries that he acted to his detriment in anticipation of receiving the promised loan. In some situations there may be a written document revealing that a loan was made in a lesser amount than the amount the borrower believed he was to receive per the oral agreement. Under the latter scenario, borrower's counterclaims for breach of contract to loan money have generally been unsuccessful because courts have held that all preliminary negotiations leading up to a written contract are merged into it when executed. *Farmers Cooperative Association, Inc.*

*v. Garrison,* 248 Ark. 948, 952, 454 S.W.2d 644, 646 (Ark.1970); *Standard Rice Co. v. H.D. Dilday, Inc.,* 191 Ark. 754, 548, 87 S.W.2d 588, 591 (Ark.1935); *Pyramid Life Insurance Co. v. Belmont,* 177 Ark. 564, 575, 7 S.W.2d 32, 36 (Ark.1928).

■ The claims regarding the $250,000 loan take several forms, including breach of contract, fraud, and breach of the duty of good faith and fair dealing. The elements for breach of contract under Arkansas law are (1) the existence of a valid and enforceable contract; (2) an obligation on the part of the defendant; (3) a breach of that obligation; and (4) damages resulting from the breach. *Rabalaias v. Barnett,* 284 Ark. 527, 683 S.W.2d 919 (Ark.1985). In order to prove a case sounding in fraud, the plaintiff must prove (1) a false representation of fact; (2) defendant's knowledge or belief that the representation is false; (3) the defendant's intent to induce plaintiff's reliance on the misrepresentation; (4) plaintiff's justifiable reliance; and (5) damages resulting from the reliance. *Bishop v. Tice,* 622 F.2d 349 (8th Cir.1980); *Wilson v. Allen,* 305 Ark. 582, 810 S.W.2d 42 (Ark.1991).

Each of these claims fail because there is no proof that the Bank made a promise to loan a particular sum of money. With regard to the contract actions, the Marks' proof fails in two respects: there is no proof that a contract existed, and, secondly, there is insufficient proof of the amount of damages. The fraud action fails for lack of a representation upon which the Marks could reasonably rely. The breach of the duty of good faith action fails for lack of a contract from which the particular duty of good faith alleged flows.[1]

Harry Pace ("Pace"), the FmHA County Supervisor, testified that at the meeting with the Marks and Wiggins, it was stated that a $50,000 revolving line of credit was contemplated from the Bank to the Marks in 1989,

---

1. Count II of the complaint is based upon the allegation that the Bank agreed that it *might* give future advances to the Marks to operate the fish farm. The implied covenant of good faith is derivative in nature, originating from an existing contract. *Glad v. Thomas County National Bank,* 1991 WL 126719 at *1, 1991 U.S.Dist. LEXIS 9099 at 3 (D.Kan. June 11, 1991) ("The duty of good faith assumes the existence of a contractual right; it does not create one."). The Marks were unable to present evidence that the Bank had a contractual duty or made a promise to loan additional money for the fish farm. Accordingly, Count II, alleging breach of duty of good faith was also subject to dismissal.

and that no additional loans were contemplated. Pace testified that Wiggins specifically discussed with the Marks the fact that there would be a maximum of $50,000 the Marks could have at one time.

The Marks did not directly refute these statements. Indeed, the Marks' own testimony indicates that they understood the terms of the promissory note and of the loan they received on March 9, 1989. Both debtors acknowledge that they knew the nature of the contract. At most, they claim in hindsight that they didn't understand the legal effect of what they signed. The evidence of Bill Marks was not that the Bank promised him the loan, but that the Bank did not say it would not loan additional funds. The only words of promise to which Marks can testify are, "We're behind you." This clearly does not rise to the level of a promise for additional funds. The Marks admit that they had received similar loans throughout their fish farming loan history with the Bank. The debtors also admit that they supplied projections for substantial earnings which also support the Bank's contention that their contract was a $50,000 closed end contract, against which the Marks could continue to draw, as long as the balance never exceeded $50,000.

There is insufficient proof of the damages from any breach of contract or that it is reasonably certain profits would have been made. Even the cases cited by the Marks support the finding that the proof is insufficient. In *Union National Bank of Little Rock v. Mosbacher*, the Eighth Circuit stated that the plaintiff must supply a "reasonably complete set of figures which will not leave the fact finder to speculate." *Union National Bank of Little Rock v. Mosbacher*, 933 F.2d 1440 (8th Cir.1990) (citing *Ishie v. Kelley*, 302 Ark. 112, 788 S.W.2d 225 (Ark.1990)), *cert. denied*, —— U.S. ——, 112 S.Ct. 870, 116 L.Ed.2d 775 (1992). In the instant case, the plaintiffs presented no figures on which to base a claim for lost profits. The business was a new one, depriving the Marks of historical sales figures from which the Court could draw conclusions. Because the Marks failed to keep any sales records, there are insufficient figures to state a particular damage amount. The stocking records are not adequate to show lost profits because they assume that the figures will be static, that no natural forces will intervene, that a static market place exists, and they do not take into account mortality figures. There is no reference to actual expenses and there is no knowledge regarding the fish in the reservoirs. The Marks' figures, by their own admissions are incomplete. Accordingly, they failed to prove the damages element of their contract claims.

The crux of the Marks' case is that they believed the Bank would continue to loan them funds and that they deserved the loan servicing. The Marks were truly surprised when the Bank did not pay on a check written in excess of their credit line. Prior to the time of the flood, whenever the Marks needed money it was given to them. Their belief appears to stem, not from a promise by the Bank, but from the fact that they worked hard. The Marks' case is based on the unrealistic belief that since the Bank gave them loans at the start of their business and since they worked hard, they deserved and therefore would have a right to continued loans. However, absent an express promise, there is no obligation on the part of a lender to keep a failing business going, despite the hard work of the operators. The belief that they deserved additional funds to make the farm work does not prove the existence of fraud or a contract.

 Count VI fails because there is no evidence from which the Court can make a determination that the Bank's debt should be subordinated pursuant to Bankruptcy Code section 510(c). In order to subordinate a creditor's claim, plaintiff must demonstrate that (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. *Bergquist v. Anderson–Greenwood Aviation Corp.* (*In re Bellanca Aircraft*), 850 F.2d 1275, 1282 (8th Cir.1988). No evidence was presented with regard to the elements of this cause of action. Indeed, there was no evidence presented that other creditors even exist. Accordingly,

Count VI of the complaint sounding in equitable subordination was subject to dismissal.

### Commercial Reasonableness

Count V of the complaint asserts that the Bank failed to dispose of the collateral in a commercially reasonable manner. The Bank asserts, through Wiggins' testimony, that it "realized all it could" from harvesting the fish and selling the Marks' equipment. The evidence is to the contrary.

The Arkansas Code provides in pertinent part:

4–9–504. Secured Party's right to dispose of collateral after default—Effect of disposition.

(1) A secured party after default may sell, lease, or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. * * *

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms, but every aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable. * * *

Ark.Code 4–9–504(1), (3). This section requires that every aspect of the disposition be commercially reasonable.

■ Once the debtor challenges the reasonableness of the disposition, the burden is upon the secured party to prove that the disposition was commercially reasonable. *Harper v. Wheatley Implement Co., Inc.,* 278 Ark. 27, 643 S.W.2d 537, 540 (Ark.1982); *Comfort Trane Air Conditioning v. Trane Co.,* 592 F.2d 1373, 1386–87 (5th Cir.1979) (Georgia law). If the secured party does not carry its burden of proof on this issue, the secured party is prohibited from recovering a deficiency judgment. *Harper,* 278 Ark. 27, 643 S.W.2d at 540 ("[W]hen the sale is conducted in a manner not in accordance with the provisions of the code, the secured party does so at his own risk. . . . However, under such condition, the debtor would not owe the difference between the price received and the commercially reasonable value of the property."); *United States v. Conrad Publishing Company,* 589 F.2d 949, 955 (8th Cir.1978) (North Dakota law); *Trane,* 592 F.2d at 1387. This rule is based upon the presumption that the value of the collateral seized is equal to the amount due on the debt. *Henry v. Trickey,* 9 Ark.App. 47, 653 S.W.2d 138, 140 (Ark.Ct.App.1983). Thus, the burden is also upon the secured party to prove the value of the collateral at the time of repossession. *See Harper,* 278 Ark. 27, 643 S.W.2d at 540; *Trane,* 592 F.2d at 1387. The secured party may, however, recover a deficiency, even though the sale was unreasonable, if it proves that the reasonable value of the collateral was less than the debt. *Henry v. Trickey,* 9 Ark.App. 47, 653 S.W.2d 138, 139–40 (Ark.Ct.App.1983); *see Deephouse Equipment Company, Inc. v. Knapp,* 38 B.R. 400 (Bankr.D.Conn.1984).

■ Commercial reasonableness is a flexible concept, "based upon a consideration of all relevant factors presented in each individual case." *Security Savings Bank, SLA v. Tranchitella,* 249 N.J.Super. 234, 592 A.2d 284 (N.J.Sup.Ct.App.Div.1991). Factors regarding disposition include the specific nature of the collateral, the nature of the special market, the length of time which elapsed between repossession and resale, and normal commercial practices in the trade. *Id.* at 239–40, 592 A.2d 284. Negligent or reckless actions of the secured party, once the secured party has taken possession or constructive possession of the collateral, will affect whether disposition was commercially reasonable. *Farmers and Merchants Bank v. Barnes,* 17 Ark.App. 139, 705 S.W.2d 450 (Ark.Ct.App.1986); *Bank of Josephine v. Conn,* 599 S.W.2d 773 (Ky.Ct.App.1980). For example, delay in disposing of the collateral, use of the collateral, or abuse of the collateral will affect the secured party's right to obtain a deficiency judgment. *See Barnes,* 17 Ark.App. 139, 705 S.W.2d 450; *Conn,* 599 S.W.2d 773. The doctrine of commercial reasonableness applies to possession as well as disposition. *BeWigged by Suzzi, Inc. v. Atlantic Department Stores, Inc.,* 49 Ohio App.2d 65, 359 N.E.2d 721 n. 4 (Ohio Ct.App. 1976).

■ In the instant case, the disposition of the collateral was clearly not conducted in a reasonable manner. Indeed, the actions of the Bank with regard to the disposition of the collateral were recklessly, if not willfully, catastrophic. The Bank destroyed valuable portions of the property by hiring persons who had neither the expertise nor equipment to harvest the fish and remove the equipment. To the extent the Bank was given advice on preserving the collateral, that advice was ignored to the detriment of the collateral, and thereby at the Bank's peril. Innumerable fish died, and were thus unsalable, as a direct result of the Bank's actions. In addition, equipment was destroyed by the Bank's actions in attempting to dismantle it without any knowledge or care with regard to that equipment.

The Bank delayed harvesting fish on the Champion farm, without credible explanation, to its own detriment. The fact that it obtained an order permitting merely thirty days to clear the Champion Farm further indicates that neither the Bank, nor the persons they hired, had the slightest inkling as to what they were doing. It made no attempt, despite the cooperation of the owners of the Day Farm, to dispose of the available collateral remaining on the Day Farm or in the various reservoirs to which it had access.

■ The Bank asserts that the duty to act in a commercially reasonable manner applies only to the collateral which was actually repossessed. While the Bank does not expound on this statement, it appears to argue that fish were not actually in its possession, *i.e.*, it asserts that the unharvested fish were not repossessed, such that no duty existed to dispose of those fish in any manner. The evidence is to the contrary. The Bank had taken all of the statutory steps to repossess the fish and had actually begun the harvesting of fish and dismantling of equipment. The Bank took the legal steps to obtain access to the land on which the collateral was found and sent its agents to actually repossess the collateral. Indeed, with respect to the Champion Farm, it had legal access which the Marks did not. In the course of disposing of the collateral, the Bank killed a number of the fish and destroyed fish on which its agents actually had placed their hands.

The Bank purportedly abandoned the actions to dispose of the collateral because disposal was not economically feasible. The evidence of this is not credible. Vickers testified that it was not feasible to harvest the fish and therefore he ceased his efforts. The evidence also showed, however, that he merely ceased advising the Bank of his efforts. The Court does not find Vickers credible. There was evidence that Vickers and Powell, the land owner, later harvested fish from the Champion Farm without the knowledge or consent of the Bank. The Court further notes that the only price information the Bank had was obtained from Vickers. It does not appear from Vickers' records, despite three months of seining fish, that many fish were actually sold on behalf of the Bank. Instead, it appears that they either died, were not disposed of, or the proceeds were not reported to the Bank.

■ As noted by the Bank, it is the aggregate of circumstances that should be emphasized, not the specific details taken in isolation. *In re Zsa Zsa Limited,* 352 F.Supp. 665, 670 (S.D.N.Y.1972), *aff'd,* 475 F.2d 1393 (2d Cir.1973). While it is true that there are reasonable limits on the lengths that lenders can be expected to go in disposing of collateral, *In re Raylin Development Company,* 110 B.R. 259, 261 n. 4 (Bankr. W.D.Tex.1989), the aggregate of circumstances in this particular case is shocking. Wiggins' red-faced embarrassment in testifying regarding the disposition efforts corroborates this. The disposition of the collateral was not attempted and/or accomplished by the actions of an entity acting in a commercial reasonable manner: it was a farce. Unfortunately, the farce was not staged by the merely chaotic actions of the actors. Rather, the circumstances are more aptly compared to a reckless, destructive force. "In the end, commercial reasonableness requires that the secured party act in good faith to maximize the returns on collateral." First National Bank in Stuttgart's Post–Trial Brief at 16 (citing *Matter of Excello Press,* 890 F.2d 896, 906 (7th Cir.1989)). Based upon the facts presented to the Court, it is clear that the

Bank did not dispose of the collateral in a commercially reasonable manner. Nor did the Bank provide sufficient evidence to establish that the collateral was worth less than the loan. Accordingly, the Bank is not entitled to a deficiency judgment against the Marks. It must look solely to the collateral in satisfaction of its debt.

Pursuant to 28 U.S.C. Section 157(c), the Bankruptcy Court makes the above report to the United States District Court for the Eastern District of Arkansas and recommends that the District Court enter judgment for the plaintiffs William H. Marks, Jr. and Ellen B. Marks a/k/a Marks Farms on Count V of the Counterclaim to the Complaint in Intervention and dismiss all other counts of the Counterclaim.

**IT IS SO ORDERED.**

DATED: Oct. 13, 1992.