No. 55,091

THE FIRST NATIONAL BANK AND TRUST COMPANY OF OKLAHOMA CITY and VIRGINIA EASON WEINMANN, Trustees Under the Will of ADA S. EASON; THE FIRST NATIONAL BANK AND TRUST COMPANY OF OKLAHOMA CITY, VIRGINIA EASON WEINMANN and JOHN G. WEINMANN, Trustees Under the Will of T. WINSTON EASON; I. WAYNE WOOLSEY; and JOAN WOOLSEY, *Appellees*, v. THE SIDWELL CORPORATION, SIDWELL OIL AND GAS, INC.; ROBERT KLABZUBA; and DAVID D. READ, JR., *Appellants*.

(678 P 2d 118)

Opinion filed February 18, 1984.

*William R. Smith,* of Hershberger, Patterson, Jones & Roth, of Wichita, argued the cause and *Jerome E. Jones,* of the same firm, was with him on the brief for appellants.

*Timothy E. McKee,* of Martin, Pringle, Oliver, Triplett & Wallace, of Wichita, argued the cause, and *Robert Martin,* of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

HOLMES, J.: The defendants appeal from a decision rendered in a trial to the court wherein a constructive trust in favor of the plaintiffs was imposed upon a portion of defendants' interests in four oil and gas leases. Plaintiffs claimed their interests by virtue of an agreement entered into between plaintiff, I. Wayne Woolsey (hereinafter Woolsey) and defendant David D. Read, Jr. The appeal was transferred from the Court of Appeals pursuant to K.S.A. 20-3018(c). We affirm the judgment of the trial court in all respects.

Plaintiff Woolsey, a petroleum geologist, was engaged in 1971 in a joint venture with T. Winston Eason and his wife. Mr. and Mrs. Eason are both deceased and the other plaintiffs, except Joan Woolsey, are successors in interest to the Easons. Plaintiff Joan Woolsey is the ex-wife of I. Wayne Woolsey. Defendant David D. Read, Jr. is a landman in the oil and gas business and is associated, insofar as this case is concerned, with the other defendants who are all connected with the oil and gas business in one way or another.

In 1971, Woolsey had studied an area in Comanche County and assembled a block of oil and gas leases covering the Mule Creek Northeast Prospect. This acreage consisted of 960 acres described as the East half of the East half of Section 7, the West half of Section 8, the West half of Section 17, and the East half of the East half of Section 18, Township 31 South, Range 17 West, Comanche County, Kansas. On October 1, 1971, Woolsey entered into an agreement with Read for development of the acreage. Portions of the agreement pertinent to this appeal provide:

"At the date of this agreement we contemplate the acquisition of additional oil and gas leases on acreage that is contiguous to this block and in the area of mutual interest as described in Exhibit "A"; and if I acquire any oil and gas leases on any of such lands in this area, then you shall have the option of paying all of the bonus consideration for such leases, plus the necessary broker's commission, and receiving an assignment of an undivided ¾ths interest in such lease or leases. If you acquire any leases on any of such lands you shall assign to me an undivided ¼th interest in such leases free and clear of cost to me.

.  .  .  .

"As to these leases in which we may own a joint interest, Sidwell Oil &˙Gas, Inc. shall be the operator of all jointly owned leases and, at an appropriate time, we will enter into an operating agreement on the form attached hereto as Exhibit 'B'.

".  .  .  . Our respective rights and obligations hereunder are those of independent contractors and nothing herein contained shall be deemed to create any relationship of mining or other partnership as between us."

The "area of mutual interest" consisted of all of Sections 7, 8, 17 and 18, the South half of Section 5, and the South half of Section 6, all in Township 31 South, Range 17 West of the Sixth P.M., Comanche County, Kansas. The following diagram shows the area of mutual interest including the Mule Creek Northeast Prospect, and the location of the Huff, Nielsen, Booth and Fisher leases and wells.

Woolsey and the defendants cooperated in the drilling of the Huff #1 well in the Southeast quarter of the Southeast quarter of Section 18 which was completed as a commercial producing gas well in late 1971. Prior to that time Woolsey and the defendants acquired the Booth lease covering 37 acres of the Southwest quarter of the Southeast quarter of Section 18. The Booth lease, dated October 5, 1971, had a primary term of five years and was located within the area of mutual interest. During the primary term of the Booth lease Lee Banks, another oil operator, acquired the three Nielsen leases located North and West of the Booth lease and within the area of mutual interest. In 1974, Banks completed a commercial gas well, the Nielsen #1, in the Northwest quarter of the Southeast quarter of Section 18.

Unbeknownst to the plaintiffs, the defendants in April, 1977, obtained a new lease on the Booth property and shortly thereafter acquired interests in the three Nielsen leases including the Nielsen #1 well. None of these acquisitions were made known to the plaintiffs and defendants did not assign a one-fourth of their working interest in the leases to Woolsey. The trial court found defendants had breached a fiduciary duty owed to plaintiffs under the original Woolsey-Read area of mutual interest agreement and imposed a constructive trust upon defendants' interests in the Booth and Nielsen leases. Defendants have appealed. Additional facts will be set forth as they become pertinent to the numerous assertions of error.

At the outset defendants contend that the evidence in this case is "largely documentary" and that the testimony on the issues was "largely uncontroverted" and therefore we "have substantially the same power as the trial court to interpret the documents and other evidence." Our role on appeal, however, does not extend to re-trying the case. Where the trial court has made findings of fact and conclusions of law, the function of this court on appeal is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *City of Council Grove v. Ossmann,* 219 Kan. 120, Syl. ¶ 1, 546 P.2d 1399 (1976); *Sunflower Electric Coop., Inc. v. Tomlinson Oil Co.,* 7 Kan. App. 2d 131, 137, 638 P.2d 963 (1981), *rev. denied* 231 Kan. 802 (1982). The record in this case discloses one hundred fifty-six exhibits were presented to the trial court and eleven wit-

nesses, several of them experts, testified during a five-day trial resulting in a transcript of six hundred fifty-nine pages. While it is true that on appeal written instruments may be construed and their legal effect determined by the appellate court (*Stanfield v. Osborne Industries, Inc.*, 232 Kan. 197, Syl. ¶ 1, 654 P.2d 917 [1982]), our freedom in this regard is limited to the documents alone. It is not the function of an appellate court to judge the credibility of the witnesses or to weigh the evidence. The trial court imposed liability on the defendants for two principal reasons: first, the area of mutual interest obligation designated in the original Mule Creek Northeast Prospect agreement was never terminated; and second, in acquiring interests in this area, defendants breached fiduciary duties owed to plaintiffs.

As their first point defendants assert error by the trial court in finding that the area of mutual interest obligation had not terminated. Defendants' principal argument that the Woolsey-Read agreement had been terminated is based upon a letter written by Woolsey to Read under date of July 9, 1976. That letter, excluding the salutation and closing, provided in its entirety:

"This letter is written to confirm our recent telephone conversation concerning areas of mutual interest established in the Wilmore and Mule Creek NE Prospects in Comanche County, Kansas.

"An area of mutual interest was established in the Mule Creek NE Prospect by a Letter Agreement dated September 29, 1971, and in the Wilmore Prospect by a Letter Agreement dated September 30, 1971. We subsequently drilled one dry hole and three producers within the prospects and have dropped the remainder of the prospects, releasing some portions of record as early as November, 1972. No time limit was set out for the areas of mutual interest although they should have terminated when we completed our development program and released the non-productive leases in November, 1972. By execution of this letter, each of us hereby terminates all of our rights as to these areas of mutual interest, effective as of December 31, 1972.

"If this meets with your approval, please so indicate in the space provided below and return one copy of this letter to the above address."

When Read received this letter he indicated his acceptance of the terms thereof "subject to acceptance of all working interest owners in the Huff well." Acceptance of the other owners was not forthcoming and Woolsey followed up his proposal to terminate the agreement by letters in August and November of 1976. Still no response was received from the defendants. The finding of the trial court that the July 9, 1976, letter was merely an offer which was never accepted by the defendants is adequately

supported by the evidence. The other arguments in support of a termination of the agreement have been carefully considered and we find them to be without merit and that the trial court's findings in respect thereto were correct.

Next the defendants assert the trial court erred in finding a fiduciary relationship was created by the area of mutual interest agreement and in finding defendants had breached that duty. Initially they contend no such duty existed as the agreement had been terminated in 1972. We have already disposed of that argument. Additionally they contend that the language in the agreement to the effect that:

"Our respective rights and obligations hereunder are those of independent contractors and nothing herein contained shall be deemed to create any relationship of mining or other partnership as between us,"

precludes the finding of a joint venture or other relationship which could give rise to a fiduciary obligation between the parties. While the court considered the quoted language it concluded that the agreement when considered in its entirety established the relationship of "joint venturers in respect to the exploration and development of the Mule Creek Prospect and, by reason of their ownership of undivided, fractional working-interest shares in oil and gas leases held for exploration and actual production operations, fiduciary obligations are imposed under the laws of Kansas." See *Foley & Loomis v. Phillips,* 211 Kan. 735, 508 P.2d 975 (1973), and cases cited therein. The court also found the fiduciary duty owed by defendants to plaintiffs was breached when defendants acquired interests in the Booth and Nielsen leases without disclosure to the plaintiffs and without complying with the specific terms of the agreement to assign one-fourth of their interests to plaintiffs. Again, the learned trial court's legal conclusions are correct and its factual findings are adequately supported by the evidence.

"A person may be both an independent contractor and an agent for another." 41 Am. Jur. 2d, Independent Contractors §2, p. 741.

See also Restatement (Second) of Agency §2(3) (1957). For a recent review on the nature of joint ventures in Kansas, see Hand, *The Joint Venture - What it is and How to Recognize its Features,* 52 J.K.B.A. 227 (Fall, 1983).

Next defendants assert the trial court erred in impressing a constructive trust upon a producing well as the agreement only

contemplated "undeveloped acreage." Defendants contend that the Nielsen #1 was drilled in 1974 and as they did not acquire their interest in the Nielsen leases until 1977, the agreement could not cover producing properties. It does not appear that this issue was properly raised before the trial court and the court made no findings or rulings based upon such an argument. The issue does not appear as one of the issues in the pretrial order and we have often held that where the parties agree on a pretrial order, which is followed by the trial court and controls the subsequent course of the action, the parties may not enlarge the issues on appeal. *Country Club Home, Inc. v. Harder*, 228 Kan. 756, Syl. ¶ 1, 620 P.2d 1140 (1980), *modified* 228 Kan. 802, 623 P.2d 505 (1981). Even if properly before this court, the argument lacks merit. The agreement is clear and unambiguous and makes no limitation that undeveloped acreage is all that is covered in the area of mutual interest agreement. To the contrary the agreement provides: "If you [Read] acquire *any leases on any of such lands* you shall assign to me [Woolsey] an undivided one-fourth interest in such leases . . . ." The Nielsen leases were within the area of mutual interest and, as the agreement had not been terminated, were included within its provisions regardless of the state of development at the time defendants obtained an interest in the leases.

Next, defendants contend that a provision in the operating agreement covering the Mule Creek Northeast Project precludes the Booth lease from being included in the court's order. As set forth earlier the Woolsey-Read agreement provided:

"As to these leases in which we may own a joint interest, Sidwell Oil & Gas, Inc. shall be the operator of all jointly owned leases and, at an appropriate time, we will enter into an operating agreement on the form attached hereto as Exhibit 'B'."

Attached to the agreement was a form operating agreement to be used in case of production, naming Sidwell Oil and Gas, Inc. as operator. It does not appear that any operating agreement was entered into at the time of the completion of the Huff #1 well in 1971. It was not until July, 1976, that the form agreement was entered into. Paragraph 23 of the operating agreement provided:

"23. Renewal or Extension of Leases

"If any party secures a renewal of any oil and gas lease subject to this contract, each and all of the other parties shall be notified promptly, and shall have the

right to participate in the ownership of the renewal lease by paying to the party who acquired it their several proper proportionate shares of the acquisition cost, which shall be in proportion to the interests held at that time by the parties in the Unit Area.

"If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the unit area to the aggregate of the percentages of participation in the unit area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all the parties elect to participate shall not be subject to this agreement.

"Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

"The provisions of this section shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; *but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this section.*

"The provisions in this section shall apply also and in like manner to extensions of oil and gas leases." (Emphasis added.)

The original Booth lease expired October 5, 1976, although Woolsey had recommended that defendants attempt to renew it or obtain a new lease. On April 29, 1977, six months and twenty-four days after the expiration of the old lease, the defendants acquired a new lease on the Booth acreage for their own personal accounts and without plaintiffs' knowledge. Defendants now contend that plaintiffs are barred from asserting any claim to the Booth lease by paragraph 23 of the operating agreement as more than six months had passed when defendants obtained the second Booth lease. Defendants' contentions fail for several reasons.

The form operating agreement which defendants seek to rely upon is a lengthy twenty-one page document governing operations of leases within the Mule Creek Northeast Prospect. The Booth lease is not included within its terms. Additionally the operating agreement was not entered into until some five years after the initial agreement controlling the obligations of the parties and appears to have been executed as an afterthought to detail the operating conditions for the Huff leases only. It did not refer to and did not include the area of mutual interest lying outside the Huff leases. We also find merit in the trial court's

ruling that defendants were estopped from relying on paragraph 23 because of their breach of fiduciary duty. Having found a fiduciary relationship existed, the scope of the duty owed was stated in *Martin v. Hunter,* 179 Kan. 578, 297 P.2d 153 (1956), as:

"Under the record in this case it was established that the relationship of joint adventurers existed between plaintiffs and defendant and, as such, they stood in a close relationship of trust and confidence, and were bound by the same standards of good conduct and square dealing as are required by partners. Each of the parties had the right to demand and expect from his associate full, fair, open and honest disclosure of everything affecting the relationship." p. 585.

Defendants not only failed to disclose to plaintiffs their acquisition of an interest in the Booth lease, they utilized information received from Woolsey in making their decisions. The trial court found that the defendants "made no new or independent geological studies in respect to their decision to acquire the Booth lease or their interest in the Nielsen property, or in respect to the location and drilling of the producing wells thereon" but instead relied solely on the valuable and confidential geological information generated and submitted to them by plaintiff Woolsey. This they could not do. See *Pratt v. Shell Petroleum Corporation,* 100 F.2d 833 (10th Cir. 1938); *Morrison v. Woodbury,* 105 Kan. 617, 185 Pac. 735 (1919). The trial court was correct in impressing the Booth lease with the constructive trust.

Defendants next contend that the rights of the Easons were personal in nature, did not survive their deaths and are barred by the rule against perpetuities.

"[T]he rule against perpetuities is that no future interest in property can lawfully be created which does not necessarily vest within twenty-one years after some life or lives presently in being, excluding from such computation of years the incipient life of infants *in ventre sa mere." Commercial National Bank v. Martin,* 185 Kan. 116, 120, 340 P.2d 899 (1959).

The rule, along with the rule against restraints on alienation, serves the same fundamental purpose of keeping property freely alienable, although the former is concerned solely with vesting of future interests in property. *Harvey v. Harvey,* 215 Kan. 472, 524 P.2d 1187 (1974). There are limits on the operation of the rule against perpetuities, however. "A transaction which is exclusively contractual is not subject to the rule against perpetuities"; the rule does not affect merely personal contracts not creating rights of property. Restatement of Property § 401 (1944); Gray, The Rule Against Perpetuities § 329 (4th ed. 1942); *Moody*

*v. Bayer Constr. Co.,* 6 Kan. App. 2d 276, 627 P.2d 1171 (1981).
We have previously acknowledged that the recent trend among
legal authorities is to relax the harsh and inflexible application of
the rule, and instead follow tenable legal theories which will
give effect to the intention of the parties. *Singer Company v.
Makad, Inc.,* 213 Kan. 725, 729, 518 P.2d 493 (1974). The contract
here did not involve the vesting of future interests in real
property and did not constitute a restraint upon the alienation of
that property. The rule against perpetuities does not apply to the
purely contractual obligations involved here. The underlying
rationale for the rule was aptly stated in *Weber v. Texas Co.,* 83
F.2d 807 (5th Cir. 1936), where the court stated:

"The rule against perpetuities springs from considerations of public policy.
The underlying reason for and purpose of the rule is to avoid fettering real
property with future interests dependent upon contingencies unduly remote
which isolate the property and exclude it from commerce and development for
long periods of time, thus working an indirect restraint upon alienation, which is
regarded at common law as a public evil." p. 808.

More directly on point is *Courseview, Inc. v. Phillips Petroleum
Co.,* 258 S.W.2d 391 (Tex. Civ. App. 1953). Although not labeled
as such, that case concerned an area of mutual interest clause
very similar to that before us presently. The court there held the
rule against perpetuities inapplicable because the transaction
was purely contractual, creating no rights in any real property.
*Courseview, Inc.,* 258 S.W.2d at 393.

Next defendants contend that plaintiffs' claims are barred by
the doctrine of equitable estoppel. The trial court in disposing of
this argument found:

"The defendants did not act in reliance upon any conduct of the plaintiffs, or any
of them, including Woolsey's proposal to terminate the area of mutual interest
obligation, which the defendants failed to accept, in acquiring or drilling the
Booth Lease for their own account without the knowledge or consent of the
plaintiffs, or in acquiring an interest in the Nielsen property for their own
account without the knowledge or consent of the plaintiffs."

The court's factual finding is amply supported by the record.

Finally, defendants claim plaintiffs are barred from recovery
because Woolsey did not come into court with "clean hands." In
the spring of 1976, Woolsey was advised by one of his other
associates in the oil and gas business that an interest in the
Fisher lease had been obtained on Woolsey's behalf. The Fisher
lease lies to the North and West of the Nielsen leases within the

area of mutual interest. Upon learning of this acquisition Woolsey promptly called Read and advised him that he (Woolsey) had acquired an interest in the Fisher lease. Defendants assert this acquisition by Woolsey was comparable to their secret negotiations and acquisition of the Booth and Nielsen interests. Reference to the terms of the initial 1971 letter agreement reveals that Woolsey fulfilled his obligation to defendants in full by simply disclosing his acquisition of an interest within the Fisher lease. The agreement provided:

"[A]nd if I acquire any oil and gas leases on any of such lands in this area, then *you shall have the option* of paying all of the bonus consideration for such leases, plus the necessary broker's commission, and receiving an assignment of an undivided ¾ths interest in such lease or leases. If you acquire any leases on any of such lands *you shall assign to me* an undivided ¼th interest in such leases free and clear of cost to me."

It is clear from the foregoing that the parties' obligations regarding the area of mutual interest were not the same. Defendants merely had the option of acquiring, at cost, an interest in any leases Woolsey acquired; thus, after disclosure of these leases by Woolsey, the burden was on defendants to move forward with this information and exercise their option. By contrast, defendants labored under a mandatory duty to disclose to Woolsey any leases they acquired in the area *and* affirmatively assign him a 25% interest without cost. In their appellate brief, defendants ask:

"[Woolsey] acquired an interest in an oil and gas lease (the Fisher lease) within the area of mutual interest without offering Defendants . . . an opportunity to participate in his venture. If Defendants' conduct in connection with the Booth and Nielsen leases constituted a breach of fiduciary duties, can Woolsey's conduct in connection with the Fisher lease be any less?"

This statement totally ignores Woolsey's disclosure to defendants of his acquired interest but, aside from the oversight, the answer to the question posed is in the affirmative. The 1971 agreement bound defendants to a higher degree of duty regarding the area of mutual interest obligation than that assumed by Woolsey. Woolsey fully performed his obligations to defendants by disclosing his leasehold interests while defendants did not even do this much, let alone assign to Woolsey the 25% interest in their leases as they were required to do by the 1971 agreement. Defendants' last claim is meritless.

This case was painstakingly tried by extremely competent trial

counsel for all parties before an experienced and learned trial judge who made detailed findings of fact and conclusions of law. In *Martin v. Hunter,* 179 Kan. 578, we stated:

"No useful purpose could be gained by narrating all the controversial evidence contained in the record. Suffice it to say that the mentioned facts were sustained by ample, competent evidence, and the court did not err in holding that the Sterling leases were part of the block of acreage obtained in the joint adventure of the parties.

"This is essentially a fact case. Plaintiffs, in effect, ask this court to retry their lawsuit. We cannot do so.

"It has been a well-established rule in this state for more than ninety years that this court accepts as true the trial court's findings of fact when they are based upon competent evidence; and on appeal it is of no consequence that there may have been much contradictory evidence adduced at the trial, which, if believed by the trial court, would have compelled entirely different findings of fact and an entirely different judgment, and when the error assigned is that the findings and judgment are contrary to the evidence, it is only necessary on appeal to consider whether there is some competent and sufficient evidence upon which the judgment is based; and a consideration or recital of the contradictory evidence cannot aid in correctly determining that question. (*Bayer v. Cockerill,* 3 Kan. 282; *Bruington v. Wagoner,* 100 Kan. 439, 164 Pac. 1057.)" p. 584.

We think the statements from *Martin* apply equally here.

The judgment is affirmed.