**In re Bernhardt William KLIPPEL, Jr., Debtor.**

**Dr. Jack KAYES, Plaintiff,**

v.

**Bernhardt William KLIPPEL, Jr., Defendant.**

**Bankruptcy No. 94–11352. Adv. No. 94–5257.**

United States Bankruptcy Court, D. Kansas.

June 23, 1995.

---

Terry C. Cupps, Foulston & Siefkin, Wichita, KS, for plaintiff.

William H. Zimmerman, Jr., Minter, Case & Zimmerman, Wichita, KS, for defendant/debtor.

John E. Foulston, U.S. Trustee, Wichita, KS.

## MEMORANDUM OF OPINION DENYING COMPLAINT TO DETERMINE DISCHARGEABILITY

JOHN K. PEARSON, Bankruptcy Judge.

This adversary proceeding is before the Court on Plaintiff Dr. Jack Kayes' ("plaintiff" or "Kayes") Complaint to Determine Dischargeability of Indebtedness. Kayes appears by Terry C. Cupps of Foulston & Siefkin, Wichita, Kansas. The debtor appears by William H. Zimmerman of Minter, Case & Zimmerman, Wichita, Kansas.

## JURISDICTION

The Court has jurisdiction over this proceeding. 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(b)(2)(I).

## NATURE OF THE CASE

The parties submitted this adversary proceeding for determination to the Court on stipulations and briefs. The plaintiff obtained a judgment against the debtor in Wilson County, Kansas, District Court, based on an investment he made in an oil production venture operated by the debtor. The Wilson County court found that the debtor had breached a general fiduciary duty to the plaintiff. However, the Court specifically found that the debtor had not committed fraud. The debtor subsequently filed bankruptcy. Plaintiff now brings this adversary proceeding to have the judgment debt declared non-dischargeable under 11 U.S.C. § 523(a)(4). As presented, this case involves a mixed question of law and fact as the Court must attempt to apply federal bankruptcy law to the state court findings of fact. The Court, for the reasons stated below, denies plaintiff's complaint and finds that the debt is dischargeable.

## STIPULATIONS OF FACT

The parties have stipulated to the following facts:

1. The debtor, Bernhardt William Klippel, Jr. (the "debtor") filed his voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code on May 31, 1994.

2. The above-captioned adversary action arises on a complaint filed by Dr. Jack Kayes (the "plaintiff") to determine the dischargeability of a debt pursuant to 11 U.S.C. § 523(a)(4).

3. Plaintiff is a judgment creditor of the debtor in the amount of $59,621.60 with interest thereon at the legal rate of 7.5% per annum from and after the fifth day of May, 1993, based upon a journal entry filed in the District Court of Wilson County, Kansas in Case No. 90–C–37 on August 20, 1993.

4. The facts as found by the [Wilson County] Court which gave rise to the Wilson County judgment are set forth in detail in the Findings of Fact and Conclusions of Law filed in connection with and incorporated in the Wilson County judgment.[1]

The parties incorporated into their stipulated facts the facts contained in Wilson County Court's Findings of Fact and Conclusions of Law. These findings of fact are:

5. In 1972, B.W. Klippel, Jr., and his wife purchased the working interests in a series of oil leases in Woodson County and Wilson County, Kansas.

6. The Klippels' purpose in purchasing the said oil leases was to salvage the equipment located on them.

7. Thereafter, Klippel changed his mind and decided to produce the leases.

8. In 1975, Klippel unitized the leases into the Buffalo Field Unit ("BFU"), a field comprised of twelve oil leases.

9. In the early 1980s, Klippel began searching for buyers of his working interest in the BFU. He prepared a number of promotional documents to provide to prospective purchasers of the working interests, including the *General Discussion,* the *Supplementary Discussion,* and the *Supplementary Discussion II.*

10. In 1984, Klippel gave Pelto Oil Company an option to purchase the leases, and allowed Pelto on the lease property to conduct drilling and production testing. Pelto drilled two wells, P–1 and P–2, on the "Apt A Lease." A dispute arose between Klippel and Pelto, and Pelto thereafter did not exercise its option to purchase. Pelto did not provide Klippel with the core analysis reports obtained from the drilling of wells P–1 and P–2. As a result, Klippel ultimately sued Pelto to obtain those results, but Klippel did not finally obtain them until 1990.

11. In 1985, Klippel sought to borrow money from Allied Bank in Houston, Texas, pledging the oil leases as collateral for the loan. Allied Bank denied his loan application.

12. In 1985 and early 1986, Klippel sent solicitation letters to people he believed might have an interest in investing in his BFU. These included letters to Barry McFarland of Allied Bank, Don Stuckey, Stanley Kielmar, and Robert Novak.

13. By the Spring of 1986, Klippel had sold little if any of his working interest in the BFU. At that time he approached Kayes about purchasing a working interest in the BFU.

14. Kayes is a doctor of ophthalmology in St. Louis, who had long-standing professional relationships with Klippel's mother and wife. That is the reason that Klippel solicited Kayes' investment in this venture. Klippel knew at that time that Kayes had no experience in the oil industry, and was relying exclusively upon Klippel for advice with respect to investment in and operation of this venture.

15. Klippel met with Kayes and introduced him to the BFU. Klippel indicated to Kayes that Klippel intended to redevelop and produce the BFU and that Klippel would be the operator of that redevelopment.

16. [Klippel gave Kayes various documents including those mentioned in ¶ 9 and ¶ 12 above.]

17. Klippel represented to Kayes that it was his plan to construct a pilot waterflood project for the purpose of producing the Lower Squirrel pay zone. This plan involved drilling four water injection wells around an existing production well (Pelto well P–2), injecting water into the Lower Squirrel pay zone through those injection wells and producing oil therefrom through the Pelto P–2 well.

18. Klippel represented to Kayes that the cost of this development was $145,000.00. In May 1986, Kayes agreed to invest in the venture.

1. Although the parties have stipulated to the "Findings of Fact" set out below, the state trial court "adopted" plaintiff's proposed findings generally, but not in the detail that this recitation would suggest. As the parties have so stipulated, the Court must determine this as submitted: as though these were the facts found by the state court. Apparently, the stipulated facts in paragraphs 5–51 were in plaintiff's proposed findings of fact submitted to the state trial court.

19. On November 1, 1986, Klippel and his wife executed an Assignment of their working interest in the Foster lease, one of the leases in the BFU, to Kayes and his wife. The Foster lease comprised 10.006452% of the Buffalo Field. Thus, Kayes paid Klippel 10.006452% of the $145,000.00 estimated project cost ($14,509.36) in return for the assignment. On that same day, Klippel and Kayes executed an Operating Agreement which appointed Klippel the operator of the leases on the BFU.

20. Prior to executing the Operating Agreement, Klippel represented to Kayes, both orally and in the promotional documents, that this was an industry standard operating agreement. Klippel also told Kayes that he would keep Kayes advised of developments on the project and provide personal recommendations on whether the project should continue.

21. Thereafter, Klippel undertook the construction of his pilot waterflood project on the BFU. At all times, Klippel continued to own a substantial portion of the working interest in the BFU.

22. Prior to Kayes purchasing the working interests in the BFU on November 1, 1986, Klippel made the following misrepresentations about the project and the investment to Kayes, either orally or in the written promotional documents:

(a) The Operating Agreement Klippel used would be an industry standard;

(b) A bank would be willing to loan the of approximately $200,000.00 secured by a first mortgage against the leases to a responsible purchaser;

(c) Klippel had received several offers to purchase the BFU for several hundred thousand dollars;

(d) The oil in the Lower Squirrel pay zone was mobile and could be waterflooded;

(e) Findings from the prior operations of Pelto Oil Company on the property indicated probable oil production from the Lower Squirrel pay zone would likely exceed the projections contained in the general discussions;

(f) Dr. Kayes could terminate further participation in the project at any time simply by telling Klippel that he wanted to;

(g) Development costs beyond the initial four well pilot waterflood project would be paid for from revenues derived from ongoing production;

(h) Future net revenues to the working interests for production on the leases should be computed on the basis of $20.00 per barrel of crude oil;

(i) Stanley Kielmar wanted to invest in Klippel's venture but lacked adequate cash flow to do it;

(j) The monthly operating costs on the project would run approximately $6,250.00.

23. Klippel also omitted to disclose the following material facts to Kayes prior to obtaining Kayes' investment in the project:

(a) Klippel had sought a loan from Allied Bank in Houston secured by the BFU, and the loan application had been denied.

(b) Klippel lacked core analysis reports on the two wells that Pelto Oil Company had drilled.

(c) Klippel was involved in a lawsuit with Pelto Oil Company to obtain the core analysis reports and other results of their exploratory operations.

(d) Kayes would have to reconvey his working interest to Klippel or someone else if Kayes wished to terminate his participation in this project.

(e) Klippel lacked sufficient funds to carry his share of working interest expense on the project.

(f) Klippel did not intend to invest further in the project, even after November of 1986.

(g) The $145,000.00 cost of the pilot waterflood project did not include costs for plugging and other operations which would more than double the cost of the project.

(h) Klippel would charge the project a management fee of $6,000.00 per month.

24. Between November 1, 1986 and March 1989, Klippel charged Kayes on the BFU for costs other than those directly associated with the construction and implementation of his pilot waterflood project. Klippel

never informed Kayes that these costs were not related to the pilot waterflood project.

25. Klippel misrepresented to Kayes the work that he was performing on the project, including particularly representations relating to the drilling of new wells on the project. For example, in Progress Report # 2, Klippel represented to Kayes that Klippel had drilled two new wells by December 20, 1986, when in fact Klippel did not drill his first well until approximately March, 1987.

26. Klippel altered his development plan by production testing the Pelto wells P–1 and P–2 without first seeking or obtaining the consent of Kayes.

27. Between November 1, 1986, and March 1, 1989, Klippel reworked wells and performed other work on the BFU not directly related to the proposed pilot waterflood project without first obtaining the consent of Kayes.

28. The results of the production tests performed on the Pelto wells in December, 1986 were unfavorable. However, Klippel did not inform Kayes of these tests results until May, 1987, and even then did not indicate that the results were unfavorable.

29. The production and core analysis test results with respect to the first well drilled by Klippel (Well I–11) were unfavorable and indicated that the proposed waterflood project would not result in sufficient production to pay the costs incurred in constructing the project. However, Klippel did not inform Kayes of this fact.

30. In his Progress Report # 6, dated June 2, 1987, Klippel misrepresented the following to Kayes:

(a) That available evidence indicated Klippel would recover as much or more oil from the BFU waterflood project as originally projected in the General Discussion.

(b) That production costs would be in line with those originally projected.

(c) That the project would break even with two or three good wells and that Dr. Kayes should anticipate those wells being produced soon.

31. Throughout the summer and fall of 1987, Klippel misrepresented to Kayes that he would begin drilling the additional injection wells promptly, when in fact Klippel did not intend to begin drilling them until Kayes and the other working interests invested substantial additional sums.

32. During that time, Klippel misrepresented to Kayes that Klippel would drill only one additional injection well and test it before drilling any additional wells, and that he would not drill such additional wells except upon obtaining favorable results from the wells he drilled.

33. In November, 1986, Klippel drilled two injection wells simultaneously: wells I–21 and I–22.

34. The costs to drill the second of these two injection wells was at least $20,000.00.

35. The tests from well I–22 were unfavorable; well I–21 was never tested.

36. Nothing about the results of these two wells indicated that the proposed waterflood development plan would be successful.

37. By October 27, 1987, the project had cost more than $250,000.00 and Kayes had contributed more than $26,000.00.

38. Prior to and at this time, Klippel failed to evaluate whether the costs of the project had rendered it unlikely that the project would be profitable.

39. Klippel failed to advise Kayes as to the financial viability of the project at that time.

40. Klippel did not drill the fourth well of his proposed pilot waterflood project until August, 1988.

41. The delays in drilling wells were caused by Klippel's unwillingness to contribute to the costs. Therefore, wells I–21 and I–22 were not drilled until Kayes and the other working interest holders made an additional investment in the project, and the fourth injection well was not drilled until the working interest holders made an even further substantial investment in the project.

42. The fourth injection well, well I–12, was drilled in August of 1988. The test results were not favorable and provided no indication that the pilot waterflood project would be profitable. Klippel never told

Kayes that these test results indicated that the project would not, in all likelihood, be profitable.

43. Thereafter, Klippel initiated his waterflood project. However, it was unsuccessful, producing no oil and only saltwater.

44. Prior to August 1989, Klippel charged the project substantial sums for the services rendered by "little b drilling" without informing Kayes that Klippel and "little b drilling" were one and the same.

45. In the spring of 1989, Klippel and Kayes met in St. Louis to discuss the project. At that time Klippel sought Kayes' consent to participate in a new development plan at a total cost of approximately $100,000.00.

46. At that meeting, Kayes refused to participate any further in Klippel's development unless and until Klippel provided Kayes with satisfactory evidence that Klippel could actually produce oil from the project.

47. Klippel promised Kayes at that meeting he would return to St. Louis to provide him with evidence that he could produce oil from the project.

48. Klippel never met with Kayes to provide him with such information, although Klippel did cancel meetings scheduled for that purpose.

49. At the time of the spring 1989 meeting, and thereafter until August, 1989, Kayes was "paid in full" to Klippel.

50. Klippel sued the other working interest holders for failing to pay their respective pro rata shares of expenses; however, Klippel never informed Kayes of these lawsuits.

51. In 1990, Akandas, Inc. sued Klippel and the other working interest holders to cancel leases covered by the Unitization Agreement on the theory that the leases had lapsed. Klippel charged the working interests for the attorney's fees he incurred to defend this lawsuit.

## DISCUSSIONS AND CONCLUSIONS

■ This adversary proceeding is before the Court on the briefs and stipulations of the parties. Plaintiff seeks to have his claim against the debtor declared nondischargeable under 11 U.S.C. § 523(a)(4) on the theory that debtor owed plaintiff a fiduciary duty, and, based on the state court judgment, that duty was breached. Plaintiff relies exclusively on the Wilson County, Kansas District Court's findings of fact and ruling that the debtor breached a fiduciary duty to him.[2] The plaintiff contends the issue of breach of fiduciary duty, previously litigated in the Wilson County court, was decided by that court and therefore the debtor is collaterally estopped from relitigating the issue in this Court. The question of the dischargeability of the judgment under § 523(a)(4) is a federal question exclusively for this Court, however. *Grogan v. Garner*, 498 U.S. 279, 284, 111 S.Ct. 654, 658, 112 L.Ed.2d 755 (1991); *In re Wallace*, 840 F.2d 762 (10th Cir.1988).

■ Collateral estoppel, or issue preclusion, is procedural concept which precludes relitigation of issues actually and necessarily decided in a prior action. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Collateral estoppel applies in bankruptcy and bars bankruptcy courts from relitigating issues if all four elements of collateral estoppel are satisfied. *In re Horst*, 151 B.R. 563, 565 (Bankr.D.Kan. 1993). These four elements are: "(1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action." *Lombard v. Axtens (In re Lombard)*, 739 F.2d 499, 502 (10th Cir.1984). Collateral estoppel applies in dischargeability actions under 11 U.S.C. § 523(a). *Grogan*, 498 U.S. at 284–85, 111 S.Ct. at 658–59; *Wallace*, 840 F.2d at 764. As the *Wallace* court noted, however, the bankruptcy court "ultimately determines whether or not a debt is dischargeable." *Wallace*, 840 F.2d at 764.

■ Of the four elements of collateral estoppel, the only one contested here is whether the state court's finding of a breach of a

2. *See* fn. 1 above.

general fiduciary is identical to the breach of fiduciary duty required to except a debt from discharge under 11 U.S.C. § 523(a)(4). The United States Supreme Court, in *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), noted: "If, in the course of adjudicating a state-law question, a state court should determine factual issues using standards *identical* to those of § 17 [the immediate statutory predecessor to 11 U.S.C. § 523(a) ], then collateral estoppel, in the absence of countervailing statutory policy, would bar relitigation of those issues in the bankruptcy court." *Id.* at 139 n. 10, 99 S.Ct. at 2213 n. 10 (emphasis added). For the following reasons, the Court concludes that issues are not identical and therefore collateral estoppel does not apply because in this circuit, a breach of a general state law fiduciary duty will not support excepting a claim from discharge under § 523(a)(4).

 One of the primary purposes of the Bankruptcy Code is to give a debtor a fresh start. To further that goal, exceptions to discharge in the Bankruptcy Code are strictly construed against an objecting creditor and in favor of the debtor. *See, e.g., In re Black*, 787 F.2d 503, 505 (10th Cir.1986); *In re Riso*, 978 F.2d 1151 (9th Cir.1992). Under § 523(a)(4) of the Bankruptcy Code, a debt is nondischargeable if the debtor has committed defalcation while acting in a fiduciary capacity. The Code does not define "fiduciary capacity," but its definition is a matter of *federal*, not state, law. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153–54, 79 L.Ed. 393 (1934).

 In this circuit, 11 U.S.C. § 523(a)(4) applies only to a fiduciary relationship arising from a technical or express trust, not from a trust implied by law.[3] *In re Romero*, 535 F.2d 618 (10th Cir.1976). Certainly, the "general definition of fiduciary—a

relationship involving confidence, trust and good faith—is too broad in the dischargeability context." *In re Weiner*, 95 B.R. 204, 206 (Bankr.D.Kan.1989) (citations omitted). In *Romero, supra*, the Tenth Circuit held that only breach of fiduciary duty arising from technical trusts or those imposed by law will render a debt nondischargeable. Further, the trust relationship must have existed *prior* to the creation of the debt in question. *Romero*, 535 F.2d at 621. Thus, breach of a constructive trust imposed after the fact would not be a basis for excepting a debt from discharge under § 523(a)(4). *See id.*

In *Romero*, the court determined that a New Mexico statute which required construction contractors to forfeit their contracting license if they diverted funds they received prior to completion of a specific project *imposed* a fiduciary duty on all contractors. *Id.* at 621–22. The court further found that this fiduciary duty existed prior to the creation of the debt. The court, therefore, held that the debt was nondischargeable due to the breach of fiduciary duty.

 In the stipulated facts in this case, the state court found some sort of a fiduciary duty existed between the debtor and plaintiff, based on the disparity in knowledge and experience in oil and gas operations, such that Klippel had a "position of ascendancy" over Kayes. *Cf.* fn. 3 (the analysis in *In re Marchiando* ). Unfortunately, the state law rationale for the state court's conclusion is not in the record. Under Kansas law, in general, a "fiduciary duty" exists among joint venturers. *See First National Bank & Trust v. Sidwell Corp.*, 234 Kan. 867, 678 P.2d 118 (1984). The scope of this fiduciary relationship is defined by "the same standards of good conduct and square dealing as are required by partners." *Id.*

---

3. *But cf. LSP Investment Partnership v. Bennett (In re Bennett)*, 989 F.2d 779, 784 (5th Cir.1993). The *Bennett* court noted, "[m]ost courts today ... recognize that the 'technical' or 'express' trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law." *Id.* at 784–85; *see also Matter of Marchiando*, 13 F.3d 1111 (7th Cir.1994) (recog-

nizing in dicta that situations of inequality may exist whereby "one party to the relation is incapable of monitoring the other's performance of his undertaking" justify imposing fiduciary duty). These decisions appear to ignore a long line of federal bankruptcy decisions dating back to the 1840s to the effect that § 523(a)(4) and its predecessors apply only to technical, express trusts. *See* below.

■ Relying on a disparity in power or knowledge between parties to a contract to impose a fiduciary relationship, while perhaps a permissible exercise of the state court's equity powers, would transform virtually every contract into a fiduciary relation-. ship. Rare indeed is the situation where parties to a contract have equal knowledge or bargaining power. As the United States Supreme Court long ago stated: "In almost all commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act." *Chapman v. Forsyth,* 43 U.S. (2 How.) 202, 11 L.Ed. 236 (1844) (interpreting one of the earliest predecessors of 11 U.S.C. § 523(a)(4)). This is especially true where the parties are involved in some joint adventure, as they are in this case. Some generic fiduciary duty is not the express or technical trust relationship required to find the debt nondischargeable under § 523(a)(4). "[U]nless there be some additional fact, section 523(a)(4), insofar as it relates to a debtor acting in a fiduciary capacity, does not apply to the frauds of agents, bailees, brokers, factors, partners, and other persons similarly situated." 3 *Collier on Bankruptcy* ¶ 523.14[1][c] at 523–107 to –108 (15th ed. 1995).

■ The courts applying Kansas and bankruptcy law have generally held that a general fiduciary duty does not except a debt from discharge under the Bankruptcy Code, absent additional factors. *In re Weiner,* 95 B.R. 204, 207 (Bankr.D.Kan.1989); *In re Novak,* 97 B.R. 47, 59 (Bankr.D.Kan.1987); *Inge v. Stillwell,* 88 Kan. 33, 127 P. 527 (1912) (interpreting § 17 of the Bankruptcy Act, from which 11 U.S.C. § 523(a)(4) is drawn). As the courts in both *Weiner* and *Novak* point out, the fiduciary duty of a partner generally will not support exception from discharge under § 523(a)(4). *See Weiner,* 95 B.R. at 207; *Novak,* 97 B.R. at 58–59. Those cases are consistent with *Romero, supra* and the long line of bankruptcy decisions since *Chapman v. Forsyth, supra,* which limit the exception to express or technical trusts.

In *In re Weiner,* the court, while noting that the general fiduciary duty which exists by virtue of statute among partners is not sufficient to bar a debt from discharge, concluded that if there were additional factors "which evidence the existence of an express or technical trust," then a court may appropriately find that a debtor was acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4). *Weiner,* 95 B.R. at 207. In *Weiner,* the debtor held professional licenses as both an attorney and a certified public accountant. He was designated as the "Administrative Partner" or "Tax Matters Partner," both of which, the court found, made him the sole managing partner of a variety of partnerships. *Id.* at 207. The court found that his professional licenses, and his holding himself out as a licensed professional, would logically lead his fellow partners to consider his "position in the partnership to be one of the highest trust." *Id.* Additionally, he performed all of the functions generally associated with a traditional trustee (i.e., "collecting, segregating, investing, dispersing, and accounting" for partnership funds.) *Id.* The court determined that these additional factors justified denying discharge under § 523(a)(4), despite the rule in *Romero* that a technical or express trust is required. While *Weiner* is based in part on the provisions of the Uniform Partnership Act, it is, in this Court's opinion, an unwarranted extension of the strict *Romero* rule.

■ Even were the Court inclined to accept the extension of the general rule in *Weiner,* the facts here do not justify excepting plaintiff's claim from the discharge. Here, the only factor which leans towards finding that a broader standard of "fiduciary duty" applies is that Klippel was the owner and operator of the project. That factor does not alone require a finding that the higher fiduciary standard exists. Unlike *Romero,* there is no statutory fiduciary duty. The only duty is the general fiduciary duty of loyalty, good faith, and fair dealing, which accompanies practically every contract and which is not sufficient to bar the discharge of a debt under 11 U.S.C. § 523(a)(4). Therefore, because the issue of whether Klippel acted in a fiduciary capacity under § 523(a)(4) is not identical with the issue

decided by the Wilson County Court, collateral estoppel does not apply, and this Court is not bound by that court's decision that a breach of fiduciary duty sufficient to support a claim under § 523(a)(4) occurred. *See Lombard v. Axtens,* 739 F.2d 499, 502 (10th Cir.1984); *Grogan v. Garner,* 498 U.S. 279, 284–85, 111 S.Ct. 654, 658, 112 L.Ed.2d 755 (1991).

The plaintiff has chosen to submit this matter essentially on the record of the state court judgment for a final determination under § 523(a)(4). While the state court may have found that the debtor breached a fiduciary duty to Kayes based on state law, this Court must make the determination based on federal bankruptcy law. This Court, not the state court, has the jurisdiction to determine the dischargeability of the debt in question. The Court concludes as a mixed question of law and fact that, the state court judgment notwithstanding, no breach of a fiduciary duty under federal bankruptcy law occurred and that the plaintiff's complaint must be overruled.

The foregoing constitutes findings of fact and conclusions of law as required by Fed. R.Civ.P. 52(a) and Fed.R.Bankr.P. 7052. A separate judgment will be entered giving effect to the determinations reached herein.