ULTRACUTS LTD., and Ultracuts Franchises, Inc.
*v.* WAL-MART STORES, INC., and Wal-Mart Canada, Inc.

CA 99-449 16 S.W.3d 265

Court of Appeals of Arkansas
Divisions III and IV
Opinion delivered May 3, 2000

*Everett Law Firm*, by: *John C. Everett*; *Shemin Law Firm*, by: *Kenneth R. Shemin*, for appellants.

*Ranae Bartlett* and *Jon B. Comstock*, for appellees.

WENDELL L. GRIFFEN, Judge. This case concerns a breach-of-contract and fraud lawsuit filed by appellants Ultracuts Ltd. and Ultracuts Franchises, Inc. (hereafter Ultracuts), against appellees Wal-Mart Stores, Inc., and Wal-Mart Canada, Inc. (hereafter Wal-Mart). The suit was based upon a purported oral agreement whereby Ultracuts was granted the right to operate its hair salons as "stores-within-a-store" in various Wal-Mart locations in western Canada. The circuit judge granted summary judgment in favor of Wal-Mart. We reverse and remand because genuine issues of fact remain to be tried.

In 1994, Wal-Mart acquired the assets of more than one hundred retail stores from Woolworth Canada, Inc. Until that time, a company called Magicuts had provided hair-care services in the Woolworth stores. However, after the buyout, Meril Rivard, the president of Ultracuts, contacted Wal-Mart about the possibility of Ultracuts placing hair salons within the new Wal-Mart stores. According to Rivard, he was informed by Brad Messer, Wal-Mart's international property manager, that Magicuts would be removed

from the stores. Later, Messer contacted Rivard through a realty agent to inform him that there was an opportunity for a hair-care provider to be placed in forty-three stores in western Canada. When Rivard expressed interest, Messer sent him four proposed lease agreements concerning four different Wal-Mart locations.

Rivard quickly executed the lease for one store in Winnipeg. However, he encountered two problems. First, the Winnipeg store manager was unhappy with the lease agreement. Secondly, he was told by Brian Luborsky, president of Magicuts, that Magicuts hair salons would be placed in some of the new Wal-Mart stores. In light of these events, Rivard requested an immediate meeting with Messer. The two met in Bentonville on October 12, 1995, and, according to Rivard, entered into the oral agreement that is the subject of this case. The purported agreement contained four parts and essentially provided that: 1) Ultracuts hair salons would occupy space in certain Wal-Mart stores in western Canada; 2) Wal-Mart would not place any other hair salons in those stores without first giving Ultracuts the right to occupancy; 3) in any market in which Ultracuts occupied space in a Wal-Mart store, Wal-Mart would not enter into a business relationship with any other salon in the market; and 4) Wal-Mart would offer space in its existing stores to Ultracuts before offering space to any other "store-within-a-store" licensees.

After the October 12 meeting, Rivard signed lease agreements for two additional stores. Ultracuts then began preparing for its entry into other Wal-Mart stores and incurred expenses for equipment, staffing, and travel.

In November 1995, Messer learned that another Wal-Mart executive named Mel Redman had made an oral agreement in 1994 promising to give Magicuts the opportunity to place its hair salons in the new Wal-Mart stores in Canada. However, neither Messer nor any other Wal-Mart representative communicated this information to Rivard. In fact, on December 4, 1995, Messer sent a letter to Rivard's realtor enclosing a list of seventeen stores in western Canada "which could have available tenant space." Rivard was instructed to contact Messer if he was interested, and Messer stated that he would "operate under the assumption that we are able to put Ultracuts in the stores." Approximately two weeks later, Rivard

wrote to Messer expressing interest in some of the listed stores and providing sketches for four others.

Still unaware of any possible conflicting agreement between Wal-Mart and Magicuts, Rivard executed a written contract with Wal-Mart in early 1996 entitled, using the British spelling, "Licence Agreement." The agreement did not contain the terms of the oral agreement entered into between Messer and Rivard on October 12. However, its stated purpose was to establish the framework within which Wal-Mart would grant Ultracuts licenses to operate hair-care salons in its stores. The agreement contained no set terms for payment or duration of the licenses, but it had schedules attached for that purpose. Schedules A and D set out the specific terms for four particular stores. Schedule B, entitled "New Store Licence Schedule" was left open for completion as further licenses were granted in other Wal-Mart stores.

By mid-1996, it became clear to Wal-Mart executives that conflicting agreements had been entered into between Ultracuts and Magicuts. A meeting was held in July 1996 during which Rivard asked that his agreement be honored. At some point he was told by David Ferguson of Wal-Mart that the Magicuts agreement preceded the Ultracuts agreement. Thus, on September 18, 1996, Ultracuts sued Wal-Mart in Benton County Circuit Court. The complaint set out the purported October 1995 oral agreement between Rivard and Messer and alleged that Wal-Mart had breached the agreement and had committed fraud by failing to disclose its conflicting agreement with Magicuts. Wal-Mart moved to dismiss the complaint on the grounds that the oral agreement, if it existed, violated the statute of frauds and the rule against perpetuities. The motion was denied, but Ultracuts later amended its complaint to characterize its agreement as a license rather than a lease to avoid the specter of those defenses.

On June 10, 1998, Wal-Mart filed its motion for summary judgment with numerous attachments, to which Ultracuts responded in kind. Wal-Mart contended that the purported oral agreement was too indefinite to enforce because it was simply an "agreement to agree." Further, it noted that, because it had not actually placed any competing hair salons in its western Canadian stores, it had not breached the agreement. The statute of frauds and

rule against perpetuities defenses were raised again as they had been in the motion to dismiss. Additionally, Wal-Mart claimed that a merger clause in the 1996 written contract negated any prior oral agreements or representations.

The motion was the subject of three separate hearings and, in the interim between the hearings, the parties continued to file affidavits, discovery responses, and excerpts from depositions. On October 16, 1998, two months before the final hearing, Ultracuts amended its complaint to set out the fourth component of the alleged oral agreement, which had not been recited in its earlier complaint, *i.e.,* that Wal-Mart had agreed to offer store space to Ultracuts before offering it to any other licensees. After the final hearing, the circuit judge granted summary judgment in favor of Wal-Mart on the breach of contract claim for the following reasons: 1) the oral agreement was too indefinite to be enforced; 2) the oral agreement had not been breached; 3) the oral agreement violated the statute of frauds and the rule against perpetuities; and 4) the oral agreement was merged into the later written contract. Summary judgment was granted on the fraud claim based on the doctrine of merger and on the absence of any reasonable reliance by Ultracuts. Additionally, the trial judge struck Ultracuts's second amended complaint. This appeal followed.

■■ Summary judgment, while no longer considered a drastic remedy, is only approved when the state of the evidence as portrayed by the pleadings, affidavits, discovery responses, and admissions on file is such that the nonmoving party is not entitled to his day in court. *Guidry v. Harp's Food Stores, Inc.,* 66 Ark. App. 93, 987 S.W.2d 755 (1999). The burden of sustaining a motion for summary judgment is on the moving party. *Id.* On appeal, we view the evidence in a light most favorable to the nonmoving party. *Id.* It is our task to decide if the granting of summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion left a material question of fact unanswered. *Hawkins v. Heritage Life Ins. Co.,* 57 Ark. App. 261, 946 S.W.2d 185 (1997).

We address first the issues regarding the merger clause. The 1996 "Licence Agreement" contained a clause which recited that it constituted the entire agreement between the parties regarding

Ultracuts' use of the "Licensed Premises." The clause further stated that there were no agreements or representations other than the ones contained therein and that all prior agreements or statements were superseded. Wal-Mart contends that, as a matter of law, this clause precludes any action by Ultracuts on a prior oral agreement. Ultracuts claims that the terms of the Licence Agreement were limited to the four particular stores expressly mentioned in the agreement.

We hold that a genuine issue of fact remains to be decided on the interpretation of the merger clause. Generally, a written contract merges with and thereby extinguishes all prior and contemporaneous negotiations, in the absence of fraud, accident, or mistake. *Farmers Cooperative Ass'n, Inc. v. Garrison*, 248 Ark. 948, 454 S.W.2d 644 (1970). The same is true regarding prior representations that are alleged to be fraudulent. *Stevens v. Arkansas Power & Light Co.*, 197 Ark. 798, 124 S.W.2d 972 (1939). Although the merger clause in this case states unequivocally that there are no agreements or representations, oral or otherwise, other than those contained in the written contract and that all prior understandings, arrangements, agreements, statements, or communications are superseded, it cannot be said as a matter of law that the contract governs all of Wal-Mart's agreements with Ultracuts on each store-within-a-store arrangement. On the one hand, the stated purpose of the agreement is to provide a framework within which the licensing operation will take place. However, the term "Licensed Premises" is defined in the contract to mean either one store or all the stores collectively. Further, the only specific terms or payment schedules contained in the Licence Agreement are for the four individual stores. Where a contract is susceptible to different interpretations, it is ambiguous. *See Lee v. Hot Springs Village Golf Sch.*, 58 Ark. App. 293, 951 S.W.2d 315 (1997). If an ambiguity exists, there is a question of fact as to the contract's meaning. *See First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164, 832 S.W.2d 816 (1992), *cert. denied*, 507 U.S. 919 (1993).

We also take into account the fact that, prior to signing the Licence Agreement, Ultracuts had already executed three other written agreements for individual stores, which at least raises the possibility that the arrangement between Wal-Mart and Ultracuts

was not going to be governed by one master agreement. Further, Wal-Mart's conduct after the Licence Agreement was executed in January 1996 may be seen as inconsistent with the notion that the contract fully integrated its agreement with Ultracuts. In mid-1996, Wal-Mart attempted to work out a compromise whereby it would give some stores to Magicuts and some stores to Ultracuts. For these reasons, we hold that the trial judge erred in granting summary judgment on both the contract and fraud claims based upon the merger clause contained in the Licence Agreement.

██ ██ The next issue concerns the trial court's ruling that the October 1995 oral agreement was too indefinite to be enforced. To have a valid contract, all terms should be definitely agreed upon. *Ciba-Geigy Corp. v. Alter*, 309 Ark. 426, 834 S.W.2d 136 (1992). *See also Kinkead v. Estate of Kinkead*, 51 Ark. App. 159, 912 S.W.2d 442 (1995). The terms must be "reasonably certain." *ERC Mtg. Group, Inc. v. Luper*, 32 Ark. App. 19, 795 S.W.2d 362 (1990). Wal-Mart claims that the alleged oral agreement in this case was simply an agreement to engage in future negotiations and so was not a definite contract. Generally, such a contract would be void for indefiniteness. *See Hatch v. Scott*, 210 Ark. 665, 197 S.W.2d 559 (1946); *Lonoke Nursing Home, Inc. v. Bennett Family Partnership*, 12 Ark. App. 282, 676 S.W.2d 461 (1984); *Phipps v. Storey*, 269 Ark. 886, 601 S.W.2d 249 (Ark. App. 1980). However, whether this oral contract was simply an agreement to agree in the future is a fact question. Although the actual rental/license prices and terms were not set in October 1995, the agreement, when viewed in the light most favorable to Ultracuts, was more in the nature of a general agreement that Ultracuts would be the exclusive hair salon in Wal-Mart stores in western Canada and would have right of first refusal regarding available space in those stores. Considering the purpose of the agreement, a factfinder could determine that it contained all terms necessary to establish a contract.

██ Next, we consider the trial judge's ruling that Wal-Mart did not breach the oral agreement. Wal-Mart argues that no breach occurred because, undisputedly, it has not placed any hair salons in its western Canadian stores other than Ultracuts. However, Wal-Mart executives made statements to Rivard indicating that they felt bound by the company's agreement with Magicuts.

These statements could constitute anticipatory repudiation. It has been said that, to prove anticipatory repudiation, one must show a present, positive, and unequivocal refusal to perform. *See Kellum v. Gray*, 266 Ark. 996, 590 S.W.2d 33 (Ark. App. 1979). It has also been said, less strictly, that a breach occurs when one party by words or conduct indicates that the agreement is being repudiated or breached. *See Oaklawn Bank v. Alford*, 40 Ark. App. 200, 845 S.W.2d 22 (1993). Wal-Mart's failure to wash its hands of the Magicuts deal coupled with a Wal-Mart executive's deposition testimony that the Magicuts deal preceded Ultracuts deal and Mel Redman's deposition testimony that he felt the Magicuts deal was binding all serve to create a fact question on the issue of anticipatory repudiation. Likewise, a fact question exists regarding whether Wal-Mart breached the fourth component of the alleged agreement, which was that Wal-Mart would offer space in its stores to Ultracuts before offering it to any other licensee. Ultracuts interprets this to mean any licensee, including non-hair salon licensees. It is undisputed that there are other licensees such as photographers or jewelers in Wal-Mart stores where Ultracuts was not offered space first. Viewing the evidence in the light most favorable to Ultracuts, a fact question remains on the point.

We now turn to the complicated issue of whether Ultracuts' cause of action for breach of contract was barred by either the statute of frauds or the rule against perpetuities. Wal-Mart contends that the October 1995 oral agreement is unenforceable because it is not in writing. Indeed, the statute of frauds provides that a contract for the lease of lands for a term of longer than one year is unenforceable unless it is in writing. Ark. Code Ann. § 4-59-101(a)(5) (Repl. 1996). Wal-Mart also contends that the agreement violates the rule against perpetuities because it gives Ultracuts a perpetual right of first refusal. Indeed, the rule against perpetuities provides that an interest in property must vest within a period measured by a life in being plus twenty-one years. *Comstock v. Smith*, 255 Ark. 564, 501 S.W.2d 617 (1973). However, neither the statute of frauds nor the rule against perpetuities applies to license agreements. *See Mikel v. Development Co., Inc.*, 269 Ark. 365, 602 S.W.2d 630 (Ark. App. 1980); *Comstock v. Smith, supra; First Nat'l Bank & Trust Co. v. Sidwell Corp.*, 234 Kan. 867, 678 P.2d 118 (1984). Wal-Mart argues in this case that the purported oral agree-

ment between it and Ultracuts is a lease, not a license. However, a genuine issue of material fact remains to be decided on this issue. A lease divests the owner/lessor of possession and the right to possession and gives the right to possession to the tenant. *Harbottle v. Central Coal & Coke Co.*, 134 Ark. 254, 203 S.W. 1044 (1918). A license, on the other hand, conveys no interest in land but is simply an authority or power to use land in some specific way. *Id.*

Arkansas courts have never addressed this distinction in the case of a hybrid lease/license like we have here. However, courts from other jurisdictions have done so. It has generally been held that one who occupies space in another's business is a licensee rather than a lessee. *See Union Travel Associates, Inc. v. International Associates, Inc.*, 401 A.2d 105 (D.C. App. 1979); *Bewigged by Suzzi, Inc. v. Atlantic Dept. Stores, Inc.*, 49 Ohio App. 2d 65, 359 N.E.2d 721 (1976); *Schloss v. Sachs*, 63 Ohio Misc. 2d 457, 631 N.E.2d 212 (1993). *But see Stevens v. Rosewell*, 170 Ill. App. 3d 58, 523 N.E.2d 1098 (1988) for a contrary holding. As the Ohio court recognized in *Schloss v. Sachs*, with today's commercial complexities, the ability to distinguish between a license and a lease is difficult. Generally, the issue is one of fact. *Union Travel Associates, Inc. v. International Associates, Inc., supra.*

 The oral agreement in this case contains elements of both a license and a lease. Further, the parties have, at one time or another, referred to their arrangement as both a lease and a license. Clearly, a fact question is presented that would preclude summary judgment.

 Wal-Mart also argues that its purported agreement with Ultracuts comes within the statute of frauds because it is a contract that cannot be performed within one year of its making. *See* Ark. Code Ann. § 4-59-101(a)(6) (Repl. 1996). This portion of the statute of frauds has been interpreted to apply only to contracts that are incapable of being performed in one year. *Chadwell v. Pannell*, 27 Ark. App. 59, 766 S.W.2d 38 (1989). It does not apply if the contract can be performed in one year, even though there is a possibility or even a probability that it may take longer. *Id.* It is possible in this case that the oral agreement could have been performed in one year, including that part of the agreement in which Ultracuts was given right of first refusal on store space. Therefore,

Wal-Mart would not have been entitled to summary judgment on this point.[1]

■ Next, we address the trial judge's determination that Ultracuts did not reasonably rely on representations made by Wal-Mart. Whether reliance is reasonable is a question of fact. *Van Dyke v. Glover*, 326 Ark. 736, 934 S.W.2d 204 (1996). It is arguable that Ultracuts's reliance was reasonable for two reasons. First, it received a letter from Brad Messer two months after the agreement that implied that the agreement was intact (the December 4 letter). Secondly, some of the Wal-Mart executives felt that they had a binding agreement with Ultracuts. In a June 1996 letter, Messer confirmed by his signature that he had agreed with Rivard in October 1995 just as Rivard now contends.

■ ■ Finally, we address Ultracuts' contention that the trial judge erred in striking its amended complaint. Arkansas Rule of Civil Procedure 15(a) provides that, upon motion of an opposing party, a trial court may strike an amended pleading based upon a determination that the amendment would result in prejudice or undue delay. A trial judge has broad discretion in allowing or denying an amendment. *Stoltz v. Friday*, 325 Ark. 399, 926 S.W.2d 438 (1996). However, an order striking an amended pleading may not be reversed absent a finding of undue delay or prejudice. *Harris v. First State Bank of Warren*, 22 Ark. App. 37, 732 S.W.2d 501 (1987). When the trial judge in this case decided to strike Ultracuts' amended complaint, he specifically found that Wal-Mart knew of the additional allegation set forth in the complaint and was not surprised by it. Further, he made no finding that the amendment would unduly delay the lawsuit. Therefore, we reverse on this point.

Reversed and remanded.

HART, STROUD, and NEAL, JJ., agree.

PITTMAN and JENNINGS, JJ., dissent.

---

[1] The trial judge did not base his decision on this portion of the statute of frauds. Wal-Mart asserts this ground as an alternative reason for affirmance.

JOHN E. JENNINGS, Judge, dissenting. I would affirm the trial court's granting of summary judgment based upon the merger clause. The purported oral agreement between the parties was a general agreement covering the basics of the entire licensing operation. Likewise, the License Agreement is a framework within which the overall licensing operation between appellants and appellees is to take place. It contains general terms applicable to any store that becomes part of the store-within-a-store arrangement. It is clearly a master agreement that covers the entire licensing operation between Wal-Mart and Ultracuts, with the details for each individual store to be recited in attached schedules or addenda. The merger clause provides that any prior understandings, arrangements, agreements, statements, or communications, oral or written, with respect to "this agreement" are superseded. I can see no ambiguity here. The parties are businessmen, dealing at arms length. They are bound by the agreement they entered into.

Because it is clear to me that the trial court was correct in granting summary judgment to the appellee on the basis of the merger clause, I would not reach the issues of the alternative bases for summary judgment.

I respectfully dissent.

PITTMAN, J., joins in this dissent.